# JOHN BATTLE v. STATE OF MARYLAND

[No. 159, September Term, 1979.]

*Decided June 6, 1980.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

*Michael R. Malloy, Assistant Public Defender,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellant.

*Diane G. Goldsmith, Assistant Attorney General,* with whom was *Stephen H. Sachs, Attorney General,* on the brief, for appellee.

SMITH, J., delivered the opinion of the Court.

Prior to consideration of this case by the Court of Special Appeals, we granted the writ of certiorari on our own motion in order that we might address the issue of whether a trial judge improperly allowed a jury to separate after its deliberations had begun.[1] However, because we find that a confusing answer was given to an unclear question propounded by the jury, we shall be obliged to reverse and remand for a new trial without reaching this interesting question.

John Battle was charged with first degree rape, assault with intent to rape, and lesser included counts. He was convicted of assault with intent to rape by a Baltimore City jury.

## I The facts

On May 25, 1978, the victim, a forty-four year old

---

[1]. After jury deliberations had begun, sleet began to cover the streets. It was in this circumstance that the jury was permitted to separate.

grandmother employed by the Department of Social Services, visited an alcoholism clinic at Sinai Hospital. From there she proceeded to Pimlico Race Track. She parked her automobile at a nearby closed service station where appellant, John Battle, was in charge of parking. When she returned to her vehicle after the races she found that Battle had washed it. She informed him she did not have any money to pay him since the previous day (a Wednesday) was payday and she had not picked up her check. He suggested that she "drive [him] past home," informing her where he lived. When she told him she did not have enough gasoline, he provided a couple of dollars for that purpose. She said that enroute to his home there was discussion relative to "a radio that he had bought that he wanted to sell because he was never at home to listen to the radio . . . and he said he would let [the victim] have the radio at a reasonable price." She stated that she accepted his invitation to examine the radio.

Upon arrival at Battle's home she accompanied him upstairs to "his room . . . to see the radio," saying she trusted him because "he looked like a nice old man." Once upstairs, however, she claimed that the situation changed. She stated that he struck her, after which the record reflects:

> He said, "I said, 'Sit down.'" I sat down. All of a sudden he got nasty; I sat down and he said, "Pull your clothes off," and I said, "You got to be kidding." He reached his hand in his pocket and pulled out a screwdriver with a black handle. I thought it was an ice pick, at that time it was very small, and he put it up against my head and told me to pull my clothes off; he said he would kill me because he killed one time and he said he would kill again.

She said because she was scared she took her clothes off and got in bed with him. From her testimony it is apparent that he effected penetration but that he did not ejaculate.

The victim testified that while she and Battle were thus engaged a persistent knocking came at the downstairs door. He went to answer it. She said that she went to a room across

the hall where she poked her head out a window, called for help, and asked that the police be called. She stated:

> I was getting ready to get out of the window on the roof and he came in and caught me and pulled me back in and hit me. He grabbed a keen stick and hit me across the back and butt.

After he had dragged her back into the bed, again disrobed and disrobed her, another alarm came at the door. While he was engaged in answering it she was able to throw something out a window to attract the attention of some nearby children. The police then come to her rescue.

Battle said the victim invited him to have sexual intercourse with her. He stated that he found her disrobed in his bedroom. He denied any sexual contact.

In the course of our discussion we shall develop such other facts as may be relevant to the points raised.

## II The question

After a period of deliberation the jury addressed a written question to the trial judge. It read:

> When a possible consensual sexual relationship becomes non-consensual for some reason, during the course of the action — can the act then be considered rape?

(The word "possible" in the question was interlined.) The trial judge said she was not certain she understood the question. She added, ". . . but as interpreted it is where the original act of sex is by consent whether is it then possible the circumstances could change because of the victim's lack of consent after the original situation began as a consensual one. . . ." She inquired whether this was correct. The jury replied in the affirmative. The trial judge then said "I will answer your question by saying, 'Yes, that it is possible for a situation to start out as consensual and then become a non-consensual one in the course of the event.' " She then

went on to quote from *Hazel v. State,* 221 Md. 464, 157 A.2d 922 (1960), where Judge Horney said for the Court:

> With respect to the presence or absence of the element of consent, it is true, of course, that however reluctantly given, consent to the act at any time prior to penetration deprives the subsequent intercourse of its criminal character. There is, however, a wide difference between consent and a submission to the act. Consent may involve submission, but submission does not necessarily imply consent. Furthermore, submission to a compelling force, or as a result of being put in fear, is not consent. [*Id.* at 469.]

She added:

> It is not altogether clear as to what degree of resistance is necessary to establish the absence of consent; that is a question that you ladies and gentlemen would have to determine on the basis of the evidence that you have heard during the course of the trial.

Additional instructions were given relative to fear and resistance.

Counsel were asked whether they had any objection to the court's instruction. Although the response of defense counsel was not as specific an objection as one might prefer, we believe the sum total of his statement was to specify that the question and answer were unclear. He said:

> In the question you related to during the course of the action you interpreted during the course of the answer you interpreted it from the question, during the course of the action as you interpreted it during the course of the intercourse, and the Court did not allude to that. I kind of speculate what the jury thought in their minds, I thought that it was wrong. The question, during the course of the action, I would say during the course of the action, one, a person is having intercourse, then during the

> intercourse of the action the person cannot claim
> and start screaming rape.

The State suggested that by the term "action" one did not know whether the jury was "talking about the whole chain of events, from the time the victim got to the parking lot" or whether the reference was to a time after the parties "got in the bedroom or maybe after they had sex."

Code (1957, 1976 Repl. Vol., 1977 Cum. Supp.) Art. 27, § 462 at the time relevant to this event read in pertinent part:

> (a) *What constitutes.* — A person is guilty of rape in the first degree if the person engages in vaginal intercourse with another person by force against the will and without the consent of the other person and:
>
> (1) Employs or displays a dangerous or deadly weapon *of* an article which the other person reasonably concludes is a dangerous or deadly weapon; or
>
> (2) Inflicts suffocation, strangulation, disfigurement, or serious physical injury upon the other person or upon anyone else in the course of committing the offense; or
>
> (3) Threatens or places the victim in fear that the victim or any person known to the victim will be imminently subjected to death, suffocation, strangulation, disfigurement, serious physical injury, or kidnapping; or
>
> (4) The person commits the offense aided and abetted by one or more other persons. [(Emphasis added.)][2]

Rape was a common law crime in Maryland prior to the enactment of this section by Chapter 573 of the Acts of 1976 pertaining to sexual offenses. Thus, it was the common law crime of rape which was before the Court in *Hazel.* However,

---

2. Chapter 146 of the Acts of 1978 made several amendments to Art. 27 for the purpose of "correcting technical errors" which included changing the word "of" in § 462 (a) (1) to "or."

the present statutory requirement of "vaginal intercourse with another person by force against the will and without the consent of the other person" is an outgrowth of the definitions of rape at common law as set forth in *Hazel*. For example, 2 J. Bishop, *Criminal Law* § 1113 (8th ed. 1892) states, "Rape is the having of unlawful carnal knowledge, by a man of a woman, forcibly and against her will." Professor Bishop refers by footnote to statements on this subject by such learned authors as East, Coke, Hale, Hawkins, Blackstone, and Russell.

The authorities are unanimous in the view that consent subsequent to the act of intercourse will not prevent its being rape. For instance, 2 J. Bishop, *op. cit.* § 1122, states:

> We have intimations that a consent given during any part of the intercourse will prevent its being rape. And certainly a consent after the assault, before the penetration, will have this effect. But as to the other question, the true view is believed to be that when the offense has been made complete by penetration, no remission by the woman or consent from her, however quickly following, can avail the man. And the Statute of Westm. 2 is express, that the liability to punishment shall remain "although she consent after." [*Id.* at 649.]

To like effect *see, e.g.,* F. Bailey and H. Rothblatt, *Crimes of Violence: Rape and Other Sex Crimes* § 433 at 279 (1973); 2 W. Burdick, *The Law of Crime* § 484 at 235-36 (1946) ("[I]n any case there can be no consent after the act, and the crime cannot be condoned by excusing or forgiving it."); Clark and Marshall, *Law of Crimes* § 5.14 at 356 (7th ed. 1967) ("[S]ubsequent consent to intercourse will not purge an assault or attempt to commit rape."); R. Anderson, *Wharton's Criminal Law and Procedure* § 309 at 643 (12th ed., 1957) ("Consent, to bar the commission of the offense, must precede the penetration."); 65 Am. Jur. 2d *Rape* § 7 at 766 (1972) ("After the offense has been completed by penetration, no submission or consent of the woman will

avail the defendant."); and 74 C.J.S. *Rape* § 11 at 474 (1952). Dean Burdick further comments:

> It is said or intimated by some that consent may be given during any part of the intercourse, that is after the penetration but before completion of the coitus. However, an examination of the cases sometimes cited in support of such a doctrine shows that such comments are dicta or else made in connection with evidence relating to the alleged non-resistance of the woman and tending to show that she consented before the act. If penetration alone completes the act, it is illogical and unsound to say that consent may follow the penetration. [*Id.* at 236.]

The reason for this view is expressed by W. LaFave and A. Scott, *Handbook on Criminal Law* § 57 (1972), in discussing consent of the victim as a defense to crimes generally:

> Condonation, the forgiveness of a criminal offense by the victim, is no defense. Sometimes this is explained on the ground that condonation is after-the-fact consent by the victim and thus cannot be any more effective than before-the-fact consent. This, however, might suggest that condonation is a defense in those circumstances where before-the-fact consent would bar conviction, but this is not the case. While before-the-fact consent may negative an element of the offense or preclude infliction of the harm to be prevented by the law in question, this is not true of subsequent condonation. Such forgiveness "has no proper place in the criminal law. The interest of the state is paramount and controls prosecutions * * * [f]or it is the public, not a complainant, that is injured by the commission of a crime." Acts by the victim alleged to constitute ratification (formal sanction, not necessarily involving forgiveness) are for the same reason no defense. [*Id.* 410-11, quoting *People v. Brim,* 22 Misc. 2d 335, 199 N.Y.S.2d 744 (1960).]

But little discussion is found in the cases on the effect of a withdrawal of consent prior to penetration. In *Wright v. State,* 23 Tenn. (4 Hum.) 194 (1843), the court said:

> It is contended, that the charge of the Judge is erroneous in this, that he said to the jury, "It is no difference if the person abused consented through fear, or that she was a common prostitute, or that she assented after the fact, or that she was taken first with her own consent, if she were afterwards forced against her will." This charge is correct in every particular, and fully sustained by authority. [*Id.* at 198.]

*State v. Auld,* 2 N.J. 426, 67 A.2d 175 (1949), is cited in 75 C.J.S. *Rape,* § 11, *supra,* along with 52 C.J. p. 1017 n. 86 for the proposition that "where the female consents, but then withdraws her consent before penetration, and the act is accomplished by force, it is rape . . . ." (52 C.J. p. 1017 n. 86 in turn cites *Wright.*) In *Auld* the court said:

> It is next urged by the defendant that the trial court committed reversible error in not charging the jury that in the commission of a rape, consent may not be withdrawn during the act of intercourse. The court fully and correctly charged all of the elements constituting the crime of rape. The jury was further instructed that consent could be withdrawn at any stage "during the preparatory acts." The general rule may be summarized as follows: Consent must precede the penetration. *Burdick, The Law of Crime, Vol. 2, § 484, at p. 235. See 44 Am. Jur., "Rape," § 8, p. 906; 52 C.J., § 26, p. 1017, and State v. McCaffrey, 63 Iowa 479, 19 N.W. 331 (Ia. 1884).* [*Id.* at 435-36.]

In *State v. Allen,* 163 Kan. 374, 183 P.2d 458 (1947), the court said:

> Appellant argues the evidence failed to disclose force was employed. It will serve no useful purpose to narrate the detailed facts of the episode. It may

be conceded, as contended by appellant, the episode started in what appellant has seen fit to denominate a mutually desirable "petting party." It also frankly should be stated the woman admitted that at one time during the episode she contemplated sexual intercourse. The trouble is, the evidence also discloses that it ceased to be a mutually desirable affair, the woman resisted and thereafter appellant resorted to force. The reason, or reasons, for her change of mind are not controlling. The fact she did change her mind, so advised appellant, and thereafter resisted his efforts is controlling. There was ample evidence on the subject of force to make that distinctly a jury question. [*Id.* at 375-76.]

Given the fact that consent must precede penetration, it follows in our view that although a woman may have consented to a sexual encounter, even to intercourse, if that consent is withdrawn prior to the act of penetration, then it cannot be said that she has consented to sexual intercourse. On the other hand, ordinarily if she consents prior to penetration and withdraws the consent following penetration, there is no rape.

The question and the answer here were confusing. In *Midgett v. State,* 216 Md. 26, 139 A.2d 209 (1958), since there was to be a reversal and remand for a new trial, the Court "deem[ed] it to be necessary and desirable for the guidance of the lower court and to avoid the expense and delay of another appeal to this Court to decide the points or questions of law raised by the objection to the instructions on the law applicable to the charge of kidnapping . . . ." *Id.* at 38. The Court said it was "clear that the instructions were not only misleading and confusing, but were particularly ambiguous with respect to the distinction between kidnapping and false imprisonment." *Id.* The discussion by Judge Horney for the Court is instructive:

In . . . *Wintrobe* [*v. Hart,* 178 Md. 289, 13 A.2d 365 (1940)], we distinguished between an instruction

which is merely erroneous but at least instructs and a misleading and confusing instruction which does not instruct at all. The erroneous though instructive instruction may not be reversible when it appears that the opposite party was not injured. But, as we said, at p. 296: "* * * instructions which are ambiguous, misleading, or confusing to jurors can never be classed as non-injurious." We hold that this is especially true in a criminal case where the jury is the judge of both the law and the facts and the instruction is merely advisory. [*Id.* at 41.]

We hold that the combination of the ambiguous question, ambiguously clarified by the trial judge, and the answer create sufficient confusion in this case to warrant reversal and a remand for a new trial.

## III Sufficiency of the evidence

Battle argues that the testimony of a witness who saw the victim "enter his house voluntarily" together with "the medical report, which showed that [the victim] had only one small injury, exonerated him" and the trial judge should have granted his motion for acquittal. We disagree. The credibility of the witnesses was for the trier of fact, the jury in this instance. The testimony of the victim, if believed by the jury, presented sufficient evidence to warrant a verdict of guilty.

## IV Speedy trial

Battle claims to have been denied a speedy trial. No argument in support of his contention is found in his brief. Thus, the State suggests that since Battle has failed to comply with Maryland Rule 831 c 5 requiring an appellant's brief to contain "[a]rgument in support of the position of the appellant," this issue has been waived. Lest there be a subsequent attack, however unjustified, upon the competency of appellate counsel, we shall proceed to a consideration of the matter.

Prior to the decision of the Supreme Court in *Klopfer v.*

*North Carolina,* 386 U.S. 213, 222-26, 87 S. Ct. 988, 18 L. Ed. 2d 1 (1967), the speedy trial provisions of the Sixth Amendment to the Constitution of the United States had not been held applicable to the states through the Fourteenth Amendment. However, such a requirement is found in Maryland Declaration of Rights, Art. 21. It has been a part of the law of this State since the adoption of our Constitution of 1776, a number of years prior to the adoption of the Constitution of the United States and thus prior to the adoption of the Sixth Amendment to that Constitution. In *Erbe v. State,* 276 Md. 541, 544-46, 350 A.2d 640 (1976), we equated the provisions of the Maryland Declaration of Rights with the Sixth Amendment. To like effect see *Stewart v. State,* 282 Md. 557, 570, 386 A.2d 1206 (1978), and *Smith v. State,* 276 Md. 521, 526-27, 350 A.2d 628 (1976).

Battle was arrested on May 25, 1978, and tried on February 13, 1979. This in itself is not an unduly prolonged period of time.

Under *Barker v. Wingo,* 407 U.S. 514, 530, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972), a balancing test is to be applied to .determine whether an accused has in fact been denied a speedy trial. We shall proceed to apply that test.

### a. The length of the delay

The State concedes that the eight month twenty day delay "might be construed to be of constitutional dimension so as to trigger the prescribed balancing test."

### b. Reasons for the delay

Battle had been released on his own recognizance. He failed to appear for arraignment on July 24. A bench warrant was then issued. He was apprehended on August 18 and placed in the Baltimore City Jail. On August 30 he apparently requested a medical evaluation which was not completed until October 3. This delayed trial. However, on September 21 he was arraigned, pled not guilty and prayed a jury trial. He was released on bail on December 1.

On December 19 the State requested a continuance because Battle was to go to trial on that day on unrelated charges which resulted in a conviction.

### c. Assertion of the right

In *Barker* the Court said:

> Whether and how a defendant asserts his right is closely related to the other factors we have mentioned. The strength of his efforts will be affected by the length of the delay, to some extent by the reason for the delay, and most particularly by the personal prejudice, which is not always readily identifiable, that he experiences. The more serious the deprivation, the more likely a defendant is to complain. The defendant's assertion of his speedy trial right, then, is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right. *We emphasize that failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial. [Id.* 407 U.S. at 531-32. (Emphasis added.)]

It appears in this instance that there was no assertion of the right until the morning of the trial.

### d. Prejudice

The trial judge carefully inquired of Battle:

> THE COURT: You don't understand me. I am asking you has your defense been in any way injured or made less possible by the fact that you have not yet been tried? Do you have anything different or any witnesses missing or anything of that type?
>
> DEFENDANT BATTLE: No, I don't have any

witnesses missing, I didn't have any witnesses missing.

Further patient interrogation by her failed to elicit any evidence of prejudice. No specification of prejudice has been made to us.

### e. Balancing of the factors

Balancing all of the factors we find no denial of the right of speedy trial.

> *Judgment reversed and case remanded to the Criminal Court of Baltimore for trial; pursuant to Maryland Rule 882 f costs are not reallocated.*