792 A.2D 1160

**Robert Matthew GLOVER,**

v.

**STATE of Maryland.**

**No. 67, Sept. Term, 2001.**

Court of Appeals of Maryland.

March 6, 2002.

George E. Burns, Jr., Asst. Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for petitioner.

Zoe Gillen White, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of Maryland, on brief), Baltimore, for respondent.

Argued before BELL, C.J., ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL, and BATTAGLIA, JJ.

BATTAGLIA, Judge.

We are required to determine whether the petitioner was denied his right to a speedy trial pursuant to the Sixth

Amendment of the United States Constitution and Article 21 of the Maryland Declaration of Rights. We hold that, given the circumstances of this case—namely, that the delays resulted from unavailability of judges and attempts to acquire complete DNA evidence, and the fact that the record does not establish prejudice—the petitioner's right to a speedy trial was not violated. We therefore affirm the judgment of the Court of Special Appeals, but on different grounds than those employed by the intermediate appellate court.

## I. Facts and Legal Proceedings

This case arises from the death of Charles Scherer, whose body was discovered in a vacant lot in Aberdeen, Maryland, on February 24, 1998. A medical examiner subsequently determined the cause of death to be blunt force injuries to the head and strangulation resulting from a severe beating.

The petitioner, Robert Matthew Glover, was arrested for the murder one year later, on February 26, 1999, and was indicted for first degree murder on March 31, 1999. Bail was denied. The petitioner remained confined for the entire pretrial period, which ultimately amounted to slightly more than fourteen months. During these fourteen months, the petitioner's trial was postponed three times.

Trial initially was scheduled for July 19, 1999, in the Circuit Court for Harford County. The State requested a postponement, however, on the ground that DNA test results had not been received from the crime lab.[1] The judge found the absence of the DNA test results to be good cause for granting the postponement, but stated that "this motion [for postpone-

---

1. The DNA analysis compared DNA extracted from bloodstains on the victim's jeans pocket and a blood sample from the petitioner. The precise date on which the samples were collected is unclear from the record. It appears, however, that a blood sample was taken from the petitioner when the petitioner was brought to police headquarters for questioning, a few months after the murder.

    According to the State, the samples were sent to the Maryland State Police Crime Laboratory sometime after the petitioner's arraignment in

ment] really is of no consequence or no meaning whatsoever, simply because you're not going to have a judge on the 19th [of July 1999] to hear this case in any event." [2] For these reasons, the court granted the postponement and charged it to the State.

Trial was rescheduled for November 1, 1999, but on that date, the court granted another postponement due to the unavailability of a judge and jurors. [3] Finding that administrative reasons were the bases for the postponement, the court charged neither party with the delay. At the postponement hearing, petitioner's counsel commented that her client, the petitioner, was "unhappy about the postponement" but that she had explained to the petitioner that, "there's nothing that could be done."

Trial was then rescheduled for January 13, 2000. One week prior to the date of trial, however, the petitioner moved to suppress the DNA evidence due to the fact that the State did not provide the defense with the complete [4] DNA discovery materials until December 23, 1999, and thereby failed to

---

late April or early May of 1999, but on June 29, 1999, the samples had to be sent to the Federal Bureau of Investigation's crime laboratory for a more detailed analysis. Two reports, dated July 7, 1999, and August 27, 1999, respectively, were generated from these tests and returned to the Harford County Sheriff's Office. Neither test could exclude the petitioner as a possible source of the DNA from the victim's jeans pocket.

In his motion to dismiss for lack of speedy trial, the petitioner contends that it was not until on or about October 12, 1999, that the State provided the DNA reports; the laboratory notes that generally accompany DNA test results were not provided until late December 1999.

**2.** The hearing on the motion for postponement in the Circuit Court for Harford County occurred on July 14, 1999; the court verbally granted the State's postponement request.

**3.** It appears that the difficulty in securing a judge resulted from, at least in part, the retirement of one of the judges on the Circuit Court for Harford County, whose position remained unfilled at the time the petitioner's trials were scheduled.

**4.** The DNA test results and serology reports were provided to the petitioner; however, the lab notes regarding testing procedures, etc.,

comply with the requirement that DNA evidence be disclosed thirty days prior to trial, pursuant to Maryland Code, Section 10–915(c)(2) of the Courts and Judicial Proceedings Article.[5] The court ruled that suppression of the DNA test results would be too extreme a remedy for the State's failure to provide the petitioner with the complete discovery materials thirty days prior to trial, and therefore, denied petitioner's motion to suppress. A continuance was granted and charged to the State. With respect to the continuance, petitioner's counsel voiced some concern over postponing the trial again, but stated that because the suppression motion was denied, "the only other remedy is a postponement, although the defense, Mr. Glover and I, don't want the postponement, but that's the only other remedy we have."

---

that generally accompany the test results, were not provided to the petitioner, nor to the State, at the time the reports were received. *See also supra* note 1. At the suppression hearing, the State represented that, upon receiving the notes from the crime lab, the State immediately hand-delivered a copy of the materials to the petitioner on December 23, 1999.

5. Maryland Code (1974, 1998 Repl.Vol.), Section 10–915 of the Courts and Judicial Proceedings Article provides, in pertinent part:

(c) Purposes.—In any criminal proceeding, the evidence of a DNA profile is admissible to prove or disprove the identity of any person, if the party seeking to introduce the evidence of a DNA profile:

(1) Notifies in writing the other party or parties by mail at least 45 days before any criminal proceeding; and

(2) Provides, if applicable and requested in writing, the other party or parties at least 30 days before any criminal proceeding with:

(i) First generation film copy or suitable reproductions of autoradiographs, dot blots, slot blots, silver stained gels, test strips, control strips, and any other results generated in the course of the analysis;

(ii) Copies of laboratory notes generated in connection with the analysis, including chain of custody documents, sizing and hybridization information, statistical calculations, and worksheets;

(iii) Laboratory protocols and procedures utilized in the analysis;

(iv) The identification of each genetic locus analyzed; and

(v) A statement setting forth the genotype data and the profile frequencies for the databases utilized.

(d) Prerequisites.—If a party is unable to provide the information required under subsection (c) of this section at least 30 days prior to the criminal proceedings, the court may grant a continuance to permit such timely disclosures.

The trial was reset for July 17, 2000. The trial was rescheduled one more time when, at a suppression hearing held on March 23, 2000,[6] the petitioner's counsel expressed concern over the length of the delay between trial dates. Counsel for petitioner indicated that the delays were very significant as she stated:

"I have made this court aware that I do plan on filing a motion to dismiss for lack of speedy trial, and I will have that in writing and prepared ahead of trial, Your Honor, but I did want to voice my concern at least today on our motions date that I believe that the July 17th date is just too long of a delay between trial dates."

The State's Attorney also expressed concern about the delays, stating:

"Your honor, the State shares in that concern also. I was not a party to the ... conference that set the July 17th date ... when I got back to my office, I found out that date had been selected and I, too, had great concern, as well as the victim's family, as to the necessity for having this case tried and brought to a quicker conclusion, and as I said to Mrs. Caruso [petitioner's counsel] earlier in our numerous conversations, it was my intention, and I believe she also agreed, that we would see if we could move that trial date up today."

Responding to these concerns, the court moved the trial date from July 17, 2000 to May 1, 2000.

On April 19, 2000, the petitioner moved to dismiss his case for lack of a speedy trial under the Sixth Amendment of the United States Constitution and Article 21 of the Maryland Declaration of Rights. On May 1, 2000, the Circuit Court, applying the four factor analysis for speedy trial claims enunciated in *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33

---

**6.** The March 23, 2000, suppression hearing concerned two statements made by petitioner at police headquarters on March 17 and 18, 1998. The court suppressed these statements because the State failed to establish the voluntariness of the defendant's statements by a preponderance of the evidence.

L.Ed.2d 101 (1972), granted the motion to dismiss and released the petitioner.[7] The court ruled that the inordinate length of the delay in this case was presumptively prejudicial and thus required constitutional scrutiny under *Barker*. Further recognizing that the petitioner unquestionably had filed his demand for speedy trial on two separate occasions, the court focused on the two remaining factors: the reason for delay and the prejudice to the defendant. With respect to the reasons for the delay, the court found that:

> "the State has offered no explanation as to why, after having obtained the defendant's blood sample in April of 1998, the DNA test results and reports were not completely available until December 23rd of 1999. The unavailability of [DNA test results] resulted in failures of discovery and is the bottom-line reason for the ultimate delay in this case."

The trial court dismissed the indictment, because it found that the State was responsible for every postponement in this case and weighed the entire delay against the State and in favor of the petitioner.

Finally, with respect to whether the defendant was prejudiced by the delay,[8] the court ruled that the pre-trial incarceration was oppressive and constituted actual prejudice. The court further inferred that the delayed indictment coupled with the delay in the trial of the case impaired the defense. Because the court found that the petitioner was deprived of his constitutional right to a speedy trial, the petitioner's indictment was dismissed.

---

**7.** As will be discussed and applied in further detail, *infra*, the four factors in a speedy trial determination are: (1) the length of delay; (2) the reasons for the delay; (3) the defendant's invocation of his right to a speedy trial; and (4) the prejudice to the defendant. *See Barker*, 407 U.S. at 530, 92 S.Ct. at 2192, 33 L.Ed.2d at 117.

**8.** To determine the final factor, courts must consider three elements: whether the pre-trial incarceration was oppressive; whether the incarceration caused the defendant excessive anxiety and concern; and whether the delay impaired the defense. *See Barker*, 407 U.S. at 532, 92 S.Ct. at 2193, 33 L.Ed.2d at 118.

Pursuant to Maryland Rule 8–201, the State appealed to the Court of Special Appeals which, in an unreported opinion, reversed the Circuit Court's dismissal of petitioner's case. The Court of Special Appeals concluded that the petitioner's counsel "could have obtained an earlier trial date, by complaining about the trial date that was scheduled and/or by putting the State on notice that a motion to dismiss would be filed unless the trial was scheduled on or before a particular date." The Court of Special Appeals emphasized that the petitioner did not object when the January 13, 2000 trial date was rescheduled for July 17, 2000, and did not complain about the newly scheduled trial date until March 23, 2000 (at which point the trial was advanced to April 28, 2000). The intermediate appellate court further stressed that the petitioner did not assert his speedy trial issue until April 19, 2000 and, quoting RICHARD P. GILBERT & CHARLES E. MOYLAN, JR., MARYLAND CRIMINAL LAW: PRACTICE AND PROCEDURE, § 42.3 at 527 (Michie 1983), stated, "[t]he request, 'Try me today!' is a far cry from that other request, 'Try me never, because you did not try me yesterday!' " On these grounds, the Court of Special Appeals found no violation of the speedy trial right and vacated the Circuit Court's dismissal of petitioner's case.

The petitioner sought, and we issued, a writ of certiorari to determine whether the Court of Special Appeals erred in vacating the Circuit Court's dismissal of petitioner's case. *See* 365 Md. 472, 781 A.2d 778 (2001). While we agree with the judgment of the intermediate appellate court, we disagree with its reasoning.

## II. Standard of Review

In reviewing the judgment on a motion to dismiss for violation of the constitutional right to a speedy trial, we make our own independent constitutional analysis. *See State v. Bailey,* 319 Md. 392, 415, 572 A.2d 544, 554–55, *cert. denied,* 498 U.S. 841, 111 S.Ct. 118, 112 L.Ed.2d 87 (1990); *see also Crosby v. State,* 366 Md. 518, 526, 784 A.2d 1102,1106 (2001)(stating that "when the issue is whether a constitutional right has been infringed, we make our own independent

constitutional appraisal"); *Jones v. State,* 343 Md. 448, 457, 682 A.2d 248, 253 (1996); *Carroll v. State,* 335 Md. 723, 736, 646 A.2d 376, 383 (1994). We perform a *de novo* constitutional appraisal in light of the particular facts of the case at hand; in so doing, we accept a lower court's findings of fact unless clearly erroneous. *See Rowe v. State,* 363 Md. 424, 432, 769 A.2d 879, 883 (2001)(conducting a *de novo* review of a trial court's legal/constitutional conclusions with respect to a denial of a motion to suppress under the Fourth Amendment, but stating that a trial court's findings of fact are reviewed under a clearly erroneous standard); *Cartnail v. State,* 359 Md. 272, 282, 753 A.2d 519, 525 (2000)(maintaining that this Court does not engage in *de novo* fact-finding); *State v. Ruben,* 127 Md.App. 430, 438, 732 A.2d 1004, 1008, *cert. denied,* 356 Md. 496, 740 A.2d 613 (1999).

## III. Discussion

The constitutional analysis to be applied in the speedy trial context was articulated by the United States Supreme Court in *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). We consistently have applied the *Barker* factors when considering alleged violations of both the Sixth Amendment of the United States Constitution and Article 21 of the Maryland Declaration of Rights.[9] *See Divver v. State,* 356

---

9. The 6th Amendment of the United States Constitution states:

"[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial...." U.S. Const amend. VI.

Article 21 of the Maryland Declaration of Rights states:

"in all criminal prosecutions, every man hath a right ... to a speedy trial by an impartial jury...." Md Decl of Rights, art. 21.

In addition to the constitutional guarantees, Section 6–103 of the Criminal Procedure Article provides that unless good cause is shown, the trial may not be later than 180 days after the defendant's (or counsel's) appearance before the court. Specifically, Section 6–103 states:

§ 6–103. Trial date

(a) Requirements for setting date.—

(1) The date for trial of a criminal matter in the circuit court shall be set within 30 days after the earlier of:

(i) the appearance of counsel; or

Md. 379, 388, 739 A.2d 71, 76 (1999)(affirming that this Court considers the United States Supreme Court's interpretation of the Sixth Amendment to be "very persuasive, although not necessarily controlling" with respect to the proper application of Article 21 of the Maryland Declaration of Rights)(quoting *Stewart v. State*, 282 Md. 557, 570, 386 A.2d 1206, 1213 (1978) and *Smith v. State*, 276 Md. 521, 527, 350 A.2d 628, 632 (1976)); *see also Bailey*, 319 Md. at 409, 572 A.2d at 552; *Brady v. State*, 291 Md. 261, 264–65, 434 A.2d 574, 576 (1981); *Jones v. State*, 279 Md. 1, 6, 367 A.2d 1, 5 (1976), *cert. denied*, 431 U.S. 915, 97 S.Ct. 2177, 53 L.Ed.2d 225 (1977); *Erbe v. State*, 276 Md. 541, 546, 350 A.2d 640, 643 (1976).

■ A post-indictment, pre-trial delay of sufficient length becomes presumptively prejudicial and thereby triggers scrutiny under the *Barker* factors. *See Doggett v. United States*, 505 U.S. 647, 651–52, 112 S.Ct. 2686, 2690–91, 120 L.Ed.2d 520, 528 (1992). Once such a delay is demonstrated, courts must balance the following four factors to determine whether a constitutional violation has occurred: the length of the delay, the reasons for the delay, the defendant's assertion of his speedy trial right, and the presence of actual prejudice to the defendant. *Barker*, 407 U.S. at 530, 92 S.Ct. at 2192, 33 L.Ed.2d at 117; *accord Doggett*, 505 U.S. at 651, 112 S.Ct. at 2690, 120 L.Ed.2d at 528. Thus, the length of delay is a

---

(ii) the first appearance of the defendant before the circuit court, as provided in the Maryland Rules.
(2) The trial date may not be later than 180 days after the earlier of those events.
(b) Change of date.—
(1) For good cause shown, the county administrative judge or a designee of the judge may grant a change of the trial date in a circuit court:
(i) on motion of a party; or
(ii) on the initiative of the circuit court.
(2) If a circuit court trial date is changed under paragraph (1) of this subsection, any subsequent changes of the trial date may only be made by the county administrative judge or that judge's designee for good cause shown.
(c) Court rules.—The Court of Appeals may adopt additional rules to carry out this section.
*See* Md.Code (2001), § 6–103 of the Crim. Pro. Art.

"double enquiry" as it both triggers constitutional analysis and is a factor in determining whether a defendant's constitutional right to a speedy trial has been violated. *See Doggett,* 505 U.S. at 651, 112 S.Ct. at 2690, 120 L.Ed.2d at 528.

While the four factors are not exclusive, they provide a framework by which courts and practitioners may determine and ensure the integrity of a constitutional right which has often been described as amorphous, fluid, and unquantifiable, and which necessarily compels courts to consider speedy trial cases on an *ad hoc* basis. *See Bailey,* 319 Md. at 414–15, 572 A.2d at 554 (stating that because the speedy trial right is "amorphous and slippery . . . it is impossible to determine with precision when the right has been denied"); *Brady v. State,* 291 Md. at 266, 434 A.2d at 577 (discussing the difficulty with weighing the factors in the balancing test and stating that "[d]espite this difficulty . . . it is the function of the court to sift through the various factors, employ some reasoned analysis to determine which are more important and which have greater impact, and reach a just determination as to which way the scales tip"); *Erbe,* 276 Md. at 546, 350 A.2d at 643 (noting that a balancing test "necessarily compels courts to approach speedy trial cases on an *ad hoc* basis")(quoting *Barker,* 407 U.S. at 530, 92 S.Ct. at 2192, 33 L.Ed.2d at 116–17). Therefore, our independent constitutional appraisal of the petitioner's speedy trial claims begins most effectively with a factor-by-factor approach.

A.   The Length of Delay

While no specific duration of delay constitutes a *per se* delay of constitutional dimension, *Barker,* 407 U.S. at 523, 92 S.Ct. at 2188, 33 L.Ed.2d at 113 (finding no basis for quantifying a specific length at which the speedy trial right might be violated), we have employed the proposition that a pre-trial delay greater than one year and fourteen days was "presumptively prejudicial" on several occasions. *See Divver,* 356 Md. at 389–90, 739 A.2d at 76–77 (1999); *Brady,* 291 Md. at 265, 434 A.2d at 576 (fourteen-month delay gives rise to a *prima facie* speedy trial claim); *Jones,* 279 Md. at 6, 367 A.2d at 5;

*Epps v. State,* 276 Md. 96, 111, 345 A.2d 62, 72 (1975); *see also Battle v. State,* 287 Md. 675, 686, 414 A.2d 1266, 1272 (1980)(noting that the State conceded that an eight-month, twenty-day delay might be of constitutional dimension).

As emphasized by the Supreme Court, the delay that can be tolerated is dependent, at least to some degree, on the crime for which the defendant has been indicted. *See Barker,* 407 U.S. at 531, 92 S.Ct. at 2192, 33 L.Ed.2d at 117 (stating that "the delay that can be tolerated for an ordinary street crime is considerably less than a serious, complex conspiracy charge"). Unlike the circumstances presented in *Divver v. State,* 356 Md. 379, 739 A.2d 71 (1999), where we found the delay of twelve months and sixteen days to be "of uniquely inordinate length for a relatively run-of-the-mill District Court case [for driving under the influence of alcohol]," *id.* at 390, 739 A.2d at 77, the delay in the case *sub judice,* while somewhat unnecessary, was not an inordinate delay for a murder case involving complex DNA evidence.

■   While the nature of the charges do not validate automatically a specified duration of delay in trial, *see Bailey,* 319 Md. at 411, 572 A.2d at 553 (finding that drug possession and distribution charges, in and of themselves, do not justify a two-year delay), courts must be cognizant of both the degree of complexity associated with a particular charge and the potential impact an adverse verdict would have on the accused. In a murder case, for example, society has an interest in an expeditious trial, *see id.* at 395–96, 572 A.2d at 545 (discussing generally the societal interest in providing a speedy trial), but society also has an interest in ensuring that sentences of life imprisonment or death are rendered upon the most exact verdicts possible.  DNA evidence may provide that exactness, and to the extent that the delay is not inordinate, society may weigh the precision which DNA evidence potentially provides more heavily than proceeding with a murder trial without such evidence in the name of expediency.

■   The fourteen-month delay certainly requires constitutional scrutiny.  It is not so overwhelming, however, as to

potentially override the other factors. The length of delay, in and of itself, is not a weighty factor, *see Erbe,* 276 Md. at 547, 350 A.2d at 644 (stating that the length of "delay is the least conclusive of the four factors identified in *Barker* ")(quoting *United States v. Brown,* 354 F.Supp. 1000, 1002 (E.D.Pa. 1973)), but rather the duration of the delay is closely correlated to the other factors, such as the reasonableness of the State's explanation for the delay, the likelihood that the delay may cause the defendant to more pronouncedly assert his speedy trial right, and the presumption that a longer delay may cause the defendant greater harm. "The length of delay . . . appears to be significant principally as it affects the legitimacy of the reasons for delay and the likelihood it had prejudicial effects." *Dickey v. Florida,* 398 U.S. 30, 48 n. 12, 90 S.Ct. 1564, 1574 n. 12, 26 L.Ed.2d 26, 38 n. 12 (1970)(Brennan, J., concurring).

B. The Reasons for the Delay

In *Bailey, supra,* we subscribed to the continuum pronounced by the Supreme Court in *Barker* with respect to the reasons for a pre-trial delay:

Closely related to length of delay is the reason the government assigns to justify the delay. Here, too, different weights should be assigned to different reasons. A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay.

*Bailey,* 319 Md. at 412, 572 A.2d at 553 (quoting *Barker,* 407 U.S. at 531, 92 S.Ct. at 2192, 33 L.Ed.2d at 117).

Pursuant to this continuum, we will analyze the delays that occurred during the post-indictment, pre-trial period of the petitioner's case. The first postponement, requested

by the State, resulted from dual factors: the unavailability of a judge and the fact that the DNA test results had not yet returned from the crime lab. The first factor—the unavailability of a judge—is clearly a neutral reason. While the State will be held accountable for this factor, *see Divver,* 356 Md. at 391, 739 A.2d at 78; *Jones,* 279 Md. at 12, 367 A.2d at 8–9; *Smith,* 276 Md. at 531, 350 A.2d at 634–35, it will not weigh heavily against the State. The second factor—the unavailability of the DNA test results—is a valid justification in these circumstances. DNA evidence is highly technical, often requiring courts to allow more time for completion of the tests and review, by both parties, of the results. This is not to say, however, that we will permit the State to act in a lackadaisical fashion. On the contrary, just as the State "has a duty to coordinate the efforts of its various criminal divisions in attempting to locate a defendant," *Brady,* 291 Md. at 267, 434 A.2d at 577, so does the State have a duty to coordinate the various criminal divisions, including those responsible for laboratory analysis, necessary to bring a defendant to trial. This duty includes, of course, ensuring that critical discovery materials, such as DNA evidence, are properly monitored and accounted for, and not simply collecting dust in state or federal crime labs. In regard to the State's *initial* request for postponement, we find no evidence that the State failed to act in a diligent manner and therefore, we conclude that these grounds for the postponement were both neutral and justified.

We digress momentarily to observe that other jurisdictions similarly have accepted some delay in order to ensure the most accurate judgment scientifically possible, specifically with respect to DNA evidence. *See State v. Stroud,* 459 N.W.2d 332, 335 (1990) (holding that a delay to obtain DNA testing meets the good cause standard when the reason for delay was outside the state's control, the DNA evidence was essential to the State's case, and the defendant failed to prove that he would suffer legally recognizable prejudice by the delay); *Gray v. State,* 728 So.2d 36, 51 (Miss.1998)(explaining that the delay of 247 days was not excessive for a capital murder case particularly because the defendant "was in a position to bene-

fit from the DNA evidence if it exculpated him from being prosecuted for ... murder"); *State v. Marcus,* 294 N.J.Super. 267, 683 A.2d 221, 234 (App.Div.1996), *cert. denied,* 157 N.J. 543, 724 A.2d 803 (1998)(finding that the delays in the defendant's trial due to "the complex issues relating to the admissibility of DNA evidence and defendant's protracted efforts to obtain his own DNA experts" were "legitimate and substantial reasons for the delay in defendant's trial"); *State v. Rojo,* 126 N.M. 438, 971 P.2d 829, 843 (1998)(refusing to weigh heavily against the State a delay in processing DNA samples because allowing additional time for processing DNA evidence could increase the likelihood of an accurate result or exculpate the defendant). Thus, while minor delays in obtaining DNA evidence will not be weighed heavily against the State, nor against a defendant seeking his or her own DNA analysis, delays likely will not be tolerated upon clear demonstrations of a failure to monitor or aggressively pursue the attainment of these results.

The second postponement in the petitioner's case occurred because, again, the Circuit Court was unable to provide both judge and jury for the petitioner's trial. While it is somewhat disturbing that a case would be scheduled twice without a judge available, this basis for the postponement can only be deemed neutral.

The third postponement, while requested by the petitioner, was in fact a result of the State's failure to comply with the discovery guidelines for DNA evidence. Granted, the DNA test results, themselves, were submitted to the petitioner well within the thirty-day requirement of Section 10–915, but the notes from the crime lab pertaining to the testing procedures and methodology were not delivered to the petitioner until approximately twenty days prior to trial (and approximately ten days prior to the scheduled motions' hearing). It is unclear from the record whether the State's failure to produce the *complete* DNA reports pursuant to discovery obligations rises to a level of negligence; it is clear, however, that the State failed to be aggressive in securing the materials necessary for its and the petitioner's thorough review. While we

understand that the scientific intensity of DNA evidence may entail slightly more time for acquisition than that which normally would be deemed acceptable, we do not understand and cannot accept the State's failure to monitor the division responsible for producing this critical evidence. DNA evidence has the potential, depending on the factual circumstances, to be completely exculpatory or virtually inculpatory. As such, the State is obligated to ensure that all materials necessary to an evaluation of the validity of the DNA test results are available to the defense as well as the State. Because the State failed to provide these results in a timely fashion, the petitioner and his counsel were left with no choice but to agree to another postponement.

Despite our admonition for the State's lack of diligence when the case was postponed for the third time, the delays in petitioner's case, as a whole, stem largely from neutral reasons. In addition, the State appears to have been as concerned with the delays as the petitioner and there is not the slightest implication that the State failed to act in good faith.

C. The Assertion(s) of the Right to a Speedy Trial

Often the strength and timeliness of a defendant's assertion of his speedy trial right indicate whether the delay has been lengthy and whether the defendant begins to experience prejudice from that delay. *See Barker*, 407 U.S. at 531–32, 92 S.Ct. at 2192–93, 33 L.Ed.2d at 117–18; *Bailey*, 319 Md. at 409, 572 A.2d at 552. The petitioner in the case *sub judice* twice asserted his right to a speedy trial. He first demanded a speedy trial in March of 1999, only two months after his indictment.[10] Then, one year later on April 19, 2000, the petitioner moved to dismiss his case for violation of his speedy trial right. The petitioner, without question, satisfies this factor.

---

**10.** The petitioner filed a demand for speedy trial in the District Court on March 3, 1999. When the case proceeded to the Circuit Court, he filed the demand in Circuit Court on March 25, 1999.

The Court of Special Appeals relied largely upon the circumstances surrounding the third postponement to support its conclusion that the petitioner failed to aggressively assert his speedy trial right. Because the petitioner failed, according to the Court of Special Appeals, to adequately assert the right, the cause of the delay was deemed more attributable to the petitioner rather than the State. While we agree that, upon learning that the third postponement resulted in a six-month delay (January 13, 1999 to July 19, 1999), the petitioner could have, and probably should have, immediately asserted his right to a speedy trial, we must disagree with the excessive weight the Court of Special Appeals places on this facet of the case. The vigorousness and timeliness of the assertion of the speedy trial right is a consideration. It cannot be deemed, however, in and of itself, the *cause* for the delay; nor can it be the determining factor in whether a constitutional violation occurred. This marks our departure from the decision of the intermediate appellate court, and in fact, is the basis upon which we opine today.

D.  Prejudice to the Defendant

In analyzing the fourth factor, actual prejudice to the defendant, we are, in essence, considering the harms against which the speedy trial right seeks to protect: (i) oppressive pre-trial incarceration; (ii) anxiety and concern of the accused; and (iii) impairment of the accused's defense. *See Bailey,* 319 Md. at 416–17, 572 A.2d at 555–56 (quoting *Barker,* 407 U.S. at 532, 92 S.Ct. at 2193, 33 L.Ed.2d at 118).

While the pre-trial incarceration was of constitutional dimension requiring scrutiny under the *Barker* factors, we do not believe that it was inordinate or unduly oppressive given the factual circumstances of this case. Specifically, the petitioner's trial was delayed as a result of a quest, by both parties, for complete and accurate DNA evidence and administrative delays resulting from the unavailability of judges.

With respect to the second element, we have recognized that emotional stress from a prolonged delay "can

be presumed to result ... from uncertainties in the prospect of facing public trial or of receiving a sentence longer than, or consecutive to, the one he is presently serving—uncertainties that a prompt trial removes." *Jones,* 279 Md. at 17, 367 A.2d at 12 (quoting *Strunk v. United States,* 412 U.S. 434, 439, 93 S.Ct. 2260, 2263, 37 L.Ed.2d 56, 61 (1973)). Those intangible personal factors "should prevail if the only countervailing considerations offered by the State are those connected with crowded dockets and prosecutorial case loads." *Divver,* 356 Md. at 393, 739 A.2d at 78–79 (quoting *Barker,* 407 U.S. at 537, 92 S.Ct. at 2195, 33 L.Ed.2d at 121)(White, J., concurring). Actual prejudice requires more than an assertion that the accused has been living in a state of constant anxiety due to the pre-trial delay. Some indicia, more than a naked assertion, is needed to support the dismissal of an indictment for prejudice. *Bailey,* 319 Md. at 417, 572 A.2d at 555–56. In the case *sub judice,* petitioner's counsel alleged that "[o]bviously, [Glover's] very anxious and concerned about [the time he's been incarcerated] ... he [lost] house and home, and ... [is] distanced from family...." Certainly these intangible factors are troublesome for any accused who is incarcerated for a lengthy duration prior to trial. These factors only prevail, however, if the State's sole basis for the postponements was crowded dockets. Because the attainment of the DNA materials was a justifiable reason, at least initially, for the postponement, we will not weigh these factors heavily for the petitioner.

Of the three elements, the most serious is the potential that a delay will impair the ability to present an adequate defense and thus skew the fairness of the entire adversarial system. A delay in trial can result in the impairment of one's defense due to both tangible factors, such as the unavailability of witnesses or loss or destruction of records, and intangible factors, including fading memories about the incident in question and a decrease in the likelihood that exculpatory witnesses can be found.

The trial court inferred an impairment of petitioner's defense because of the time period that elapsed between the

date of the offense, the indictment, and the date of trial.[11] During the hearing on the motion to dismiss, the petitioner alluded to missing witnesses and faded memories, but this argument was made largely with respect to the pre-indictment delay, which is not an issue presently before us.[12] We cannot find any evidence on the record that indicates that the petitioner's defense was impaired as a result of the delay, and we are unwilling to presume or infer that such an impairment existed when, as we stated earlier, the delay was not excessive or inordinate. As the Supreme Court stated in *United States v. Marion*, 404 U.S. 307, 321–322, 92 S.Ct. 455, 464, 30 L.Ed.2d 468, 479 (1971),

> Passage of time, whether before or after arrest, may impair memories, cause evidence to be lost, deprive the defendant of witnesses, and otherwise interfere with his ability to defend himself. But *this possibility of prejudice at trial is not itself sufficient reason to wrench the Sixth Amendment from its proper context.* Possible prejudice is inherent in any delay, however short; it may also weaken the Government's case.

(emphasis added). To the extent that the trial judge found prejudice, we believe his findings of fact were clearly erroneous.

## IV. Conclusion

Balancing the four factors is undoubtedly a sensitive task, completely dependent on the specific facts presented by each unique case. In carrying out this difficult task, we are

---

11. The period of time relevant to speedy trial analysis begins with the date of arrest or filing of indictment, in this case, February 26, 1999, *see Divver*, 356 Md. at 388–89, 739 A.2d at 76, and not the date of the offense (February 24, 1998).

12. The petitioner challenged the pre-indictment delay on due process grounds. To prevail, the petitioner was required to establish both (1) actual prejudice, and (2) that the delay was purposefully made by the State to gain a tactical advantage over the accused. *See Clark v. State*, 364 Md. 611, 645, 774 A.2d 1136, 1156 (2001). The trial court did not rule on the petitioner's pre-indictment delay motion. The issue of pre-indictment delay is not before this Court.

mindful that our task is to ensure that the petitioner's right to a speedy trial has not been violated; we are also mindful, however, that delay is often the result of efforts to ensure the highest quality of fairness during a trial. The fairness of a trial is particularly sensitive in cases in which DNA evidence may play a critical role in determining the guilt or innocence of an accused murderer. The acquisition or availability of DNA evidence does not mean that a defendant's speedy trial rights have diminished import. On the contrary, and with respect to the case at hand, we wish to emphasize that the State was not as aggressive in its pursuit of the DNA evidence, both the test results and the supporting documents, as we believe is required under statute, *see* Md.Code, § 10–915 of the Courts and Judicial Proceedings Article (outlining the requirement that DNA evidence be presented at least thirty days prior to trial), and under the universally accepted duty of the State to bring the defendant to trial. *See Bailey*, 319 Md. at 395, 572 A.2d at 545. Nevertheless, we do not believe that the delay unduly prejudiced the defendant.

The peculiar circumstances of this case, namely the attempts to acquire complete DNA evidence, coupled with the fact that no evidence on the record established prejudice, leads us to our conclusion that the petitioner's speedy trial right was not violated. Therefore, while we disagree with the reasoning of the Court of Special Appeals, we affirm the ultimate judgment.

***JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY THE PETITIONER.***

BELL, C.J., ELDRIDGE, and HARRELL, JJ., dissent.

Dissenting Opinion by HARRELL, J., in which BELL, C.J. and ELDRIDGE, J., join.

I respectfully dissent in this fact-bound case. The trial judge's dismissal of the indictment was legally correct, in my view. Contrary to the conclusions offered in the Majority's analysis, the record does *not* reflect that the delays occasioned by the DNA testing process and transmittal of the results and

related documentation to the defense was due, as the Majority hints, to the inherent complexities of DNA testing (Maj. op. at at 226). Also, the Majority is mistaken in its claim that the record is devoid of evidence that the State was other than diligent (*Id.*). Rather, the delay of concededly constitutional dimension in this case was caused by what may be described as avoidable benign neglect and institutional snafus on the part of the State and its units.[1]

The victim was discovered by law enforcement authorities on 24 February 1998. The State, therefore, had early access to samples of the victim's blood and the jeans he was wearing when discovered, from which jeans a bloodstain on a pocket was discovered much later that became a critical focus of the DNA analysis. Unfortunately, and for reasons that go unexplained on this record, the pocket bloodstain evidence went undiscovered by the authorities until sometime in late April-early May 1999.[2] The authorities had obtained a blood sample from Petitioner in May or June 1998; however, Petitioner was not arrested until 26 February 1999, over a year after the victim's body was discovered, and was not indicted until 31 March 1999.

The record is obscure as to when the samples were forwarded, and to which laboratory initially, for DNA testing. The State's written trial postponement request, filed on 2 July 1999, stated as grounds for a postponement, *inter alia,* "scientific evidence (D.N.A. testing results) not back from F.B.I.

---

**1.** In *Doggett v. United States,* 505 U.S. 647, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992), the Supreme Court said:

Between diligent prosecution and bad-faith delay, official negligence in bringing an accused to trial occupies the middle ground. While not compelling relief in every case where bad-faith delay would make relief virtually automatic, neither is negligence automatically tolerable simply because the accused cannot demonstrate exactly how it prejudiced him.

505 U.S. at 656–57, 112 S.Ct. at 2693, 120 L.Ed.2d at 531.

**2.** The prosecutor explained to the court at a 14 July 1999 hearing on the State's initial postponement request that the bloodstain on the pocket was discovered while "going through the evidence for a closer look."

Crime Lab. . . ." At the 14 July 1999 hearing on this postponement request, the prosecutor represented to the court that he was informed by a person from the Maryland State Police's Crime Laboratory on 30 June 1999 "that the sample had to be sent on to the FBI crime lab for more detailed analysis and would not be ready for trial on" 19 July 1999.[3] He explained further that the State Police had "just recently" received the jeans pocket bloodstain and, "they were having a hard time pulling off and matching on the preliminary type testing they do, so it had to be sent to the FBI crime lab." Finally, the prosecutor maintained that the State Police crime laboratory was not able to perform the "level of analysis" required.

The record, however, does not reveal that any of the samples ever were sent to the FBI for testing. Rather, it appears that the Maryland State Police crime lab performed both of the DNA tests in this case. In a letter, dated 30 July 1999,[4] from the prosecutor to Petitioner's attorney transmitting the Maryland State Police Crime Laboratory Division's lab report[5] results of a Polymerase Chain Reaction (PCR) test on the samples, the State notes that it was still awaiting results of testing from the Trace Unit of *that division*. A second round of DNA test results, also apparently from tests conducted by the State Police crime lab, was relayed to Petitioner's counsel by the prosecutor in a letter dated 8 October 1999. This second State Police crime lab report, dated 27 August 1999, contained results apparently obtained via the Restriction Fragment Length Polymorphism (RFLP) process,[6] although

---

3. The prosecutor who argued the postponement request also mentioned he had only been "recently . . . assigned to the matter," taking over for an earlier assigned prosecutor.

4. A copy of the letter was filed with the court on 2 August 1999.

5. The report is dated 7 July 1999, but does not contain any clear indication when and from whom the samples were received initially, whether the samples had been routed initially to the FBI, or when the test was conducted. It could be inferred from the file number (# F98–130), however, that a file on the matter was opened in 1998.

6. *See Williams v. State*, 342 Md. 724, 744–45 n. 6, 679 A.2d 1106, 1117 n. 6 (1996), for a technical explanation of the PCR and RFLP testing processes.

that process was not mentioned as such in the report. Thus, it appears *prima facie* that the State Police crime lab indeed was capable of performing the more sophisticated RFLP test, the suggestions to the contrary in the State's initial postponement justification notwithstanding. We also are left to wonder on this record what role, if any, the FBI crime lab may have played in the matter, other than the mere invocation of its name to interject some verisimilitude into the State's justification for the initial postponement.

Petitioner, on 23 August 1999 at the latest, asked for the testing notes from the State Police crime lab regarding any DNA testing. The prosecutor supplied the chemist's notes from the PCR testing, but, at a 20 December 1999 court hearing, claimed that crime lab personnel advised him that no notes were taken relative to the RFLP test. Petitioner's counsel registered surprise that no notes existed for the more sophisticated RFLP test in light of the facts that notes were made on the less sophisticated PCR test and the results of the RFLP test depicted as "uninterpretable" 3 of the 6 genetic markers obtained from the DNA profile of the jeans pocket bloodstain when compared to Petitioner's DNA profile from his blood sample.

Two days after the 20 December 1999 hearing, the prosecutor forwarded to Petitioner's counsel copies of the chemist's notes from the second DNA test that was the subject of the 27 August 1999 report. As the prosecutor explained to the court at a 6 January 2000 hearing on Petitioner's Motion To Suppress the DNA evidence, the confusion over whether notes existed for the presumed RFLP test was occasioned by: (1) different chemists conducting the PCR and RFLP tests; (2) both chemists leaving State employment in September 1999; (3) the next assigned contact person at the State Police crime lab responsible for the case could not find the notes from the second test (which were in a file at the lab); and, (4) it took the involvement of the lab supervisor and others to search and locate the notes. Essentially, the prosecutor chalked-up the delay to unintentional internal confusion at the crime lab caused by imprecision in the transfer of responsibilities.

The upshot of this was another postponement on 6 January 2000 of the 13 January 2000 trial date. Although the court denied Petitioner's suppression motion as to the DNA evidence, it later granted his motion to dismiss for want of a speedy trial, concluding that "the State has offered no explanation as to why ... the DNA test results and reports were not completely available until December 23rd of 1999. Th[at] unavailability of this material resulted in failures of discovery is the bottomline reason for the ultimate delay in this case. In the final analysis, the State is responsible for each and every postponement of this case."

This is what the record of this case reveals. As is patently clear, the delays attributable to the obtention of samples and DNA testing were laid at the feet of the State. The delays were not occasioned by the complexity of testing. Therefore, it is of concern to me that the Majority, in its analysis of the *Barker v. Wingo* considerations, glosses over and misstates what the record shows and, instead, leads the analysis down a theoretical primrose path that bears no relevance to the facts and permissible inferences present in this case. In its examination of the *Barker* "reasons for delay" factor, the Majority reasons that "DNA evidence is highly technical, often requiring courts to allow more time for completion of the tests and review, by both parties of the results." (Maj. op. at 226). It then acknowledges, however, the "State [has] a duty to coordinate the various criminal divisions, including those responsible for laboratory analysis, necessary to bring a defendant to trial. This duty includes, of course, ensuring that critical discovery materials, such as DNA evidence, are properly monitored and accounted for, and not simply collecting dust in State or federal crime labs. In regard to the State's initial request for postponement, we find no evidence that the State failed to act in a diligent manner and therefore, we conclude that these grounds for the postponement were both neutral and justified." (*Id.*).

Except for its inability to find "evidence" in the record "that the State failed to act in a diligent manner" [7] and its erroneous

---

7.  The Majority, later in its analysis of the reasons for delay, chastises the State for its "failure to comply with discovery guidelines for DNA

conclusion that the "grounds for the [initial] postponement were both neutral and justified," I accept the Majority's generalizations about societal expectations and the scientific complexities of DNA testing. Where I part company, however, is that this record reveals *no* evidence that the State acted diligently, but rather much evidence and inferences to the contrary. It is this state of the evidence, which was before the trial court, that leads me to conclude the trial judge was correct.

---

evidence," but only with regard to locating and delivering to Petitioner the chemist's notes from the second round of DNA tests (Maj. op. at at 227–28). Just as briefly, however, the Majority excuses the gravamen of its "admonition" because, in its view, "the delays in petitioner's case, as a whole, stem largely from neutral reasons." (*Id.* at 228). Fundamentally, it is that last generalization with which the trial judge and I disagree.