**MATTHEW VAISE V. STATE OF MARYLAND, Case No. 2205, Sept. 2018**

**SPEEDY TRIAL – SIXTH AMENDMENT – EFFECT OF NCR PLEA CHANGE DURING TRIAL PREPARATION ON *BARKER* ANALYSIS.**

In a complex murder case involving a defendant whose criminal responsibility was in question after he entered an NCR plea sixteen months into the parties' trial preparation, when the State was prepared to proceed to trial, the focus of speedy trial analysis under *Barker v. Wingo*, 407 U.S. 514 (1972), is on the NCR-related delay that occurred after the change in plea paused and then re-set the proverbial clock on trial preparation.

**SPEEDY TRIAL – SIXTH AMENDMENT – EFFECT OF NCR EVALUATION ON TRIAL PREPARATION.**

When a dispute arose about the defendant's criminal responsibility following an NCR diagnosis by psychiatrists at Clifton T. Perkins Hospital, a single NCR-related postponement taken by the State to conduct an independent evaluation of the defendant's criminal responsibility did not carry dispositive weight in the *Barker* analysis. Although further delay raised constitutional concern, the State was entitled to a reasonable opportunity for its expert to evaluate appellant. *See Carey v, State*, 299 Md. 17, 22 (1984); *Goins v. State*, 293 Md. 97, 107 n.7, 111 (1982).

**SPEEDY TRIAL – SIXTH AMENDMENT – WEIGHT OF NCR-RELATED DELAY – LENGTH AND REASONS FACTORS UNDER *BARKER*.**

NCR-related postponements were neutral in the *Barker* analysis because they afforded both parties a reasonable period to evaluate appellant's criminal responsibility. Alternatively, given the parties' mutual agreement to these evaluations, and that the State's sole NCR-related postponement did not cause as much trial delay as the NCR-related postponements requested by appellant, the length and reasons for NCR-related postponements requested by the defendant and the State offset each other.

**SPEEDY TRIAL – SIXTH AMENDMENT – WEIGHT OF NCR-RELATED DELAY – ASSERTION OF RIGHT TO SPEEDY TRIAL AND PREJUDICE FACTORS UNDER *BARKER*.**

Appellant's belated assertion of his right to a speedy trial and his failure to show prejudice weigh against him in the *Barker* analysis, where the State was prepared to proceed to trial when appellant changed his plea, defense counsel waited two years after his boilerplate request for a speedy trial to object and another four months to move for dismissal, the State's NCR evaluation triggered less trial delay than the NCR evaluation requested by appellant, there was no actual prejudice to appellant's case, and appellant's complaints about pretrial incarceration were undercut by the record.

Circuit Court for Baltimore City
Case No.  115072020

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2205

September Term, 2018

_____

MATTHEW STEPHEN VAISE

v.

STATE OF MARYLAND

_____

Reed,
Shaw Geter,
Raker, Irma S.
    (Senior Judge, Specially Assigned),

JJ.
_____

Opinion by Shaw Geter, J.
_____

Filed:  May 4, 2020

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document
is authentic.



Suzanne C. Johnson, Clerk

On January 29, 2015, the body of Stephen Vaise was discovered in his Baltimore home, lying in a pool of blood. After his death was ruled a homicide by gunshot, the State charged Stephen's son, appellant Matthew Stephen Vaise, with first-degree murder and use of a firearm in the commission of a crime of violence. Following a mistrial, appellant was re-tried over twelve days before a jury in the Circuit Court for Baltimore City, which convicted him of second-degree murder and use of a firearm in the commission of a crime of violence, and in a bifurcated proceeding, found him criminally responsible. Appellant was sentenced to thirty years for the murder, consecutive to twenty years for the firearm offense, without the possibility of parole during the first five years.

Appellant presents the following questions for our review:

1. Did the trial court err in allowing the State to introduce irrelevant and prejudicial other crimes evidence?

2. Did the trial court err in denying Appellant's motion to dismiss for violation of his right to a speedy trial?

3. Did the trial court err in refusing to grant Appellant's motion for mistrial when the State allowed a portion of Appellant's statement, which was supposed to have been redacted, to be played for the jury?

Concluding there was no error or abuse of discretion, we shall affirm appellant's convictions. In doing so, we shall examine the effect of appellant's change in plea to "not criminally responsible" on his Sixth Amendment right to a speedy trial.

**BACKGROUND**

Thomas Vaise ("Thomas"),[1] who lived at 203 Riverview Road, Brooklyn Park, in Anne Arundel County, was close to his brother Stephen, whose only child was appellant. According to Thomas, approximately three weeks before January 29, 2015, Stephen brought appellant to Thomas' house. Stephen was upset and asked Thomas to let his son stay there overnight while Stephen was at work. Stephen explained that he was worried about appellant, who lived with him, because there were "some people" who were "after" appellant. While Stephen and Thomas were talking, appellant went into the basement and got a beer from the supply Stephen left at his brother's house. Thomas, who does not drink, refused to let appellant stay because he was already drinking alcohol.

At 3:33 p.m. on January 29, Baltimore City Police Officer Anthony Hargrove went to 4403 Prudence Street, in Baltimore, to conduct a well-being check for Stephen. This visit was prompted by a call from Stephen's employer, who reported that, uncharacteristically, he had not been to work for two days. The doors of the house were locked, and nothing looked abnormal about the residence.

A short time later that day, around 4:30 p.m., Thomas returned to his house from work, to find his front door open. When he entered, appellant was sitting in a chair, drinking a beer. Appellant wondered where his father was, saying he had not seen him for the past three days. When Thomas asked how appellant, who had not been given a key, got into his house, appellant answered that he came in through the open cellar door. After

---

[1] Because of their shared family name, we shall refer to Thomas and Stephen Vaise by their first names. We shall refer to Matthew Vaise as appellant.

2

Thomas found the molding along that door broken, he called the Anne Arundel County Police.

At 5:40 p.m., Corporal Brian Daughters[2] arrived at Thomas' home to investigate a possible burglary. Thomas showed him the cellar door and explained the circumstances in which he found appellant.[3]

Appellant told Daughters that he came to his uncle's house looking for his father, whom he had been unable to contact. Appellant explained that he last saw his father around 9:00 p.m. on Monday, January 26, when he left his house following an argument between the two. When asked whether he contacted Baltimore City police, appellant claimed he did, but he was treated like he was crazy. Appellant did not trust the Baltimore City Police, and believed federal authorities should investigate.

Thomas then reported that he had just received two voice-mail messages from Stephen's employer stating that Stephen had not shown up for work, which was inconsistent with Stephen's record. Daughters requested an evidence collection unit at Thomas' residence to process the scene at Thomas' house while he drove appellant to Stephen's house in an effort to contact him. While driving to Stephen's residence, appellant told the officer that he had left his house key inside. Appellant claimed that when

---

[2] Daughters was a corporal at the time, but by the time he testified at trial, he was a sergeant.

[3] Appellant was later charged with burglary of Thomas' residence.

he returned to the house at 9:00 a.m. the morning after he and his father argued, he saw Stephen's car, but no one answered the door.

Stephen's red sedan was still parked at the house, covered in snow. While appellant waited in the police vehicle, Daughters checked outside the residence. Both front and back doors were locked, and there were no indications of a break-in.

When Daughters asked appellant whether someone else had a key, appellant suggested that his father's friend might have one. Around 6:40 p.m., they retrieved a key from that individual. During that encounter, appellant told his father's friend that he spent the last two evenings at Bloody Pond[4], an undeveloped area popular for recreational off-roading vehicles.

Returning to Stephen and appellant's residence at 7:06 p.m., Corporal Daughters opened the back door and saw Stephen Vaise's body lying on the floor in the doorway between the kitchen and living room. A large pool of blood under his head had begun to coagulate, and the body was cold. He suffered seven gunshot wounds to his head and chest. In the living room were eight cartridge casings and one metal fragment.

The victim had bags of groceries in his hands and was surrounded by a lot of things, including a machete, a hammer, and five bullet shell casings. Police concluded that the machete, hammer, and casings were placed at the scene by the killer.

---

[4] "Bloody Pond" is sometimes referred to as plural, Bloody Ponds. For consistency, in this opinion we will refer to it as Bloody Pond.

Police also found a note signed by appellant, dated January 26, 2015, stating: "This man is a crook who steals people's identities and murders people. He has associations with various LEAs and RICO with mafia ties." With the note was a business card for a private detective named Roland Miller. In addition, the electrical power for the house was turned off. The State later argued to the jury that "the crime scene's manipulated" and that appellant was the person who "would do that[.]"

At 12:34 a.m. on January 30, 2015, Detective Martin Young interviewed appellant following his waiver of rights. Over the course of seven hours, appellant stated he had valuable information for police but needed assurances of protection before disclosing it. According to appellant, he expected hundreds of people to be arrested and convicted based on what he knew.

Appellant had not seen his father in three or four days, since Monday, January 26th, around 9:00 or 10:00 p.m., when Stephen locked the door behind him. Since then, appellant had been spending his nights at Bloody Pond.

After calling his father's work and learning that he did not show up, appellant believed his father was murdered. Appellant called the Anne Arundel County Police to make a report and made inquiries about where his father could be on Tuesday and Wednesday; he also made a couple of trips to the house, but no one answered the door.

Appellant told the detective that at the time his father was killed, he had been researching Roland Miller, who appellant initially described as a person who stole identities and murdered people. Later, appellant claimed that Miller was an investigator for the Office of the Public Defender who kept contacting him to get people "off the hook."

5

According to appellant, he believed his father was safe from the consequences of the research appellant was doing as long as he stayed away.

Appellant also identified James Lee Reid[5] as a person who raped him, falsely accused him of being a federal agent, stole identities, ripped off credit cards, and was involved with drug dealers. Appellant accused Reid or his associates of killing his father to steal his credit information.

Appellant related that on January 3, 2015, he and his father bought a rifle from Christopher Penvose because they were scared and wanted the weapon for their personal safety.[6]

Appellant admitted that he and his father had frequent arguments, explaining that they "scream and yell at each other . . . a couple times a week[.]" Although his father had been calling the police a lot lately because he had been cranky, appellant claimed that they never had a physical altercation. Yet, he also stated that Stephen had him "locked up" for assault in December, then bailed him out of jail the next day. According to appellant, his father did not want appellant to be locked up, just to leave the house for the night.

Detective Kimberly Starr testified that on December 9, 2014, she responded to the Vaise residence at 4403 Prudence Street, in reference to a 911 call by a father complaining

---

[5] Although Reid's last name is spelled differently elsewhere in the trial transcripts, we shall use this spelling for consistency.

[6] Penvose later testified that on January 3, 2015, he sold a Hi-Point rifle to Stephen and appellant for $350, after Stephen told him he wanted the weapon for home protection. As part of the sale, Penvose gave them Hornady "ammo." Because Stephen had to straighten out a DUI, appellant took possession of the weapon. When Penvose learned that Stephen was killed, he called police to tell them about the rifle.

6

that his son was blaring music and would not turn it down, followed by a "911 hangup." When Starr knocked on the door, appellant answered and calmly said everything was fine, but Stephen yelled that his son "had come in his room and jumped on him" and "was shaking him." Appellant began yelling, saying that he "couldn't get his father to wake up" and that he was worried he had taken too much medication.

After another officer arrived, Stephen showed the detective his broken glasses and where he was sleeping when appellant jumped on him. He said, "he tried to call [police] but his son broke his cell phone." He also showed the detective "where the alarm system was pulled off the wall" by appellant and told her he could not "find his house phone." After calming down outside the presence of his son, Stephen "said that he was afraid" of appellant.

As Detective Starr explained the procedures for charging documents and protective orders, Stephen asked her to "do [her] job" and make his son leave the house, but she replied that she "could not just put someone out of their home." The detective decided to arrest appellant for assault because Stephen and appellant "were screaming at each other," and Stephen "was afraid" after appellant had broken Stephen's glasses and cell phone, removed the landline, and disabled the alarm system, leaving Stephen without any way to call for help.

When the transport vehicle arrived, appellant yelled that he was going to be killed in jail. Stephen then said he did not want his son arrested. The detective responded: "no disrespect to you, I really don't care what you want, because when he kills you, it's not going to be my fault."

7

On February 11, 2015, Randolph Turner, a crime lab technician executing a search warrant at Stephen and appellant's residence, took photos and recovered another cartridge casing in the basement. Upstairs in the front bedroom, sitting out on the bed, he collected a Hornady 9mm box of ammunition and other ammunition, as well as a soft case for a rifle. In the middle bedroom, he recovered a "bill of sale for the" Hi-Point rifle and an unfired 9 mm cartridge.

On the way back to Baltimore City Headquarters, Turner realized that he inadvertently left his departmental camera and a brown paper bag in the middle bedroom. When he and other officers returned for these items, appellant refused to let them in, even after Detective Hunter "begged" him to let him "get the property back." In the room where Turner left the camera, the light "kept switching . . . on and off, on and off, on and off." The detective then got an arrest warrant charging appellant "for the stolen property[.]"

On February 16, Tasha Aytes Rogers, a member of the police department's latent print unit, returned with detectives. When Turner's camera was recovered in the second floor middle bedroom, it was broken into pieces. Spotting a rifle barrel between the mattress and the box spring, against the wall, Rogers and a detective recovered the barrel of the Hi-Point rifle that Penvose sold to appellant, partially disassembled and missing its stock. A firearms examiner tested the weapon and determined that the nine cartridge cases recovered by police near the body and in the basement were fired with that rifle.

Appellant was arrested on February 20, 2015, "for the trespass at his uncle's house." Appellant's friend Charles Granger bailed him out and, the next day, took him back to his residence on Prudence Street. They entered through a basement window, gathered things

8

for appellant to stay with him, and looked throughout the house for clues about who killed Stephen.

Appellant had expressed fear that people were looking for him and told Granger that his father bought a rifle for him because of that. They did not find the rifle but two or three boxes of ammunition and the case for the rifle in Stephen's room. After appellant found his key to the house, they returned to Granger's home, but went back to appellant's house "two or three times." Appellant and Granger later went to the police station to tell them what they had found in the house.

Granger also knew James Reid, describing his own relationship with him as "[r]ocky" but appellant's relationship with him as "best friends." Granger testified that Reid was "just a liar" and "a con artist" who "was in bad shape" from drug use. Reid and appellant "were always getting into trouble."

On February 23, 2015, appellant made another recorded statement to police, denying that he killed his father. During that interview, Detective Raymond Hunter informed appellant that police had recovered the camera, the Hi-Point rifle, and cartridge casings fired from that rifle. In addition, he told the detective that he had "pointed the gun at the ground and go bang, bang, bang the bullets go right into the ground[.]" He denied that his father hid the rifle from him, noting that he "bought me that gun because he was afraid for my safety."

Appellant insisted that someone who knew James Reid was the killer, because although Reid "was incarcerated before this happened[,]" he "has been extorted in some

9

very serious drug dealing." Appellant also admitted smashing the camera, saying "no one told me that was a police camera."

Appellant testified on his own behalf that on January 26, 2015, he had "printed out a lot of information" about people who were "after" him. When he talked to his father about providing that information to the FBI office in Baltimore, Stephen "thought it was a real bad idea."

Appellant was "really scared" and left the house without his key. He stayed at a vacant house that night, then stayed the next two nights at Bloody Pond in a tent. Between January 26 and January 29, 2015, appellant returned to the house he shared with his father "more than once[.]" Although his father's car was there, no one answered when he knocked, so he figured his father was not home each time. He did not break inside because when he had "on two other occasions," his father "got really mad at him."

By January 29, 2015, appellant was cold and tired, so he went to his uncle Thomas' house. Appellant entered through the basement door, as he did while he was in school. He "sat on the couch, drinking beer" and waited a couple hours until Thomas got home and called police.

Appellant could not remember everything he told police over the course of multiple interviews. He was paranoid because he had not slept and was having problems with several people who were after him due to money he owed for drugs. Appellant believed that his father was killed by people who were after him for taking their drugs.

While appellant was incarcerated, he gave James Reid permission to cash a $34,000 life insurance check, mistakenly thinking it was not real. After Reid used one or two

thousand dollars toward commissary orders for appellant, he disappeared with the rest. Appellant received collection notices forwarded to him in jail from Reid's address.

After the jury convicted appellant of second-degree murder and use of a firearm in the commission of a crime of violence, a bifurcated proceeding was held to determine whether appellant was criminally responsible. Appellant presented expert testimony by Dr. Amanda Square, a forensic psychiatrist who, at the time she evaluated appellant, was employed by the State at Clifton T. Perkins Hospital Center. She testified that around Stephen's murder, appellant reported being "extraordinarily paranoid," "extremely fearful for his life," "unable to sleep," and that he had reduced his substance abuse so he could be vigilant lest someone try to kill him. Dr. Square interviewed Thomas Vaise, Roland Miller, James Reid, and other family and friends. She also considered detention records from 2013, documenting that appellant "was overtly psychotic" and treated with antipsychotic medication.

Dr. Square initially diagnosed appellant as a schizophrenic with multiple substance abuse disorders and an antisocial personality disorder. Based on that evaluation, she concluded that at the time of his father's murder, appellant was not criminally responsible. When the State later requested that she consider additional information in her diagnoses and conduct another evaluation, she reviewed recorded calls that appellant made while incarcerated and information about an incident when appellant called his father's workplace, saying that there was going to be a murder/suicide. Dr. Square did not change her opinion as to criminal responsibility.

11

The State presented testimony by Dr. Richard A. Ratner, another expert in forensic psychiatry. Dr. Ratner agreed with Dr. Square's diagnoses of antisocial personality disorder and a variety of substance abuse disorders, but he disputed the diagnosis of schizophrenia. Dr. Ratner testified that, instead, appellant "is a manipulative psychopath[.]" As a substance abuser with considerable experience in the criminal justice system, "he lies with impunity and without shame, only changing the story when the lie has been conclusively proved." Dr. Ratner concluded that appellant's claims of amnesia about the shooting were not consistent with schizophrenia or the staged crime scene, but rather "linked to his wishes to avoid the consequences of his acts." The psychiatrist opined that even though appellant reported psychotic states that cleared up with antipsychotic medicines, he was not previously diagnosed or medicated for schizophrenia. In Ratner's view, appellant's "poly drug abuse[,]" working both individually and in combination, "is the most likely explanation" for any psychosis. The psychiatrist concluded that appellant was criminally responsible at the time of the murder.

In rebuttal, the defense called Dr. Annette Hanson, a forensic psychiatrist who, as director at Perkins and the University of Maryland program in which Dr. Square was a fellow, supervised Dr. Square's evaluation of appellant. After participating in two of the three interviews of appellant and reviewing Dr. Ratner's report, Dr. Hanson agreed with Dr. Square's diagnosis and observed that Dr. Ratner's report inappropriately reflected "personal antipathy or animosity towards" appellant. Yet Dr. Hanson acknowledged that "this is a difficult case" in which "reasonable clinicians really could disagree."

12

The jury found appellant criminally responsible. We shall add material from the record in our discussion of the issues raised by appellant.

## DISCUSSION

### I. Evidence of the December 9, 2014 Altercation

After prevailing on a pretrial motion *in limine*, the State presented evidence at trial that on December 9, 2014, appellant had an altercation with his father, resulting in a call to 911, police intervention, and appellant's arrest for assault. Appellant, invoking the prohibition against evidence of "other crimes, wrongs, and acts" under Md. Rule 5-404(b), contends that the motion court and the trial court erred in ruling that such evidence was admissible. Applying established standards and precedent governing evidence of other crimes, we hold that the court did not err in admitting the challenged evidence.

### A. Standards Governing Admission of "Other Crimes, Wrongs, or Acts" Evidence

Maryland Rule 5-404(b) governs admissibility of evidence concerning culpable conduct other than that for which a defendant is on trial. In pertinent part, the rule provides:

> **(b) Other Crimes, Wrongs, or Acts.** Evidence of other crimes, wrongs, or acts . . . is not admissible to prove the character of a person in order to show action in conformity therewith. Such evidence, however, may be admissible for other purposes, such as proof of motive, opportunity, *intent*, preparation, common scheme or plan, knowledge, identity, or absence of mistake or accident.

Md. Rule 5-404(b) (emphasis added).

13

The rule "is designed to protect the person who committed the 'other crimes, wrongs, or acts' from an unfair inference that he or she is guilty not because of the evidence in the case, but because of a propensity for wrongful conduct." *Winston v. State*, 235 Md. App. 540, 563, *cert. denied sub nom. Mayhew v. State*, 458 Md. 593 (2018). "The primary concern underlying the Rule is a 'fear that jurors will conclude from evidence of other bad acts that the defendant is a 'bad person' and should therefore be convicted, or deserves punishment for other bad conduct and so may be convicted even though the evidence is lacking.'" *Hurst v. State*, 400 Md. 397, 407 (2007) (quoting *Harris v. State*, 324 Md. 490, 496 (1991)).

This Court has summarized the restrictions on admitting "other crimes" evidence under Rule 5-404(b), as follows:

> It is well-settled that subject to several exceptions, evidence of other crimes is not admissible in Maryland. It may be admissible, however, if the "evidence is substantially relevant to some contested issue in the case and is not offered to prove guilt based on propensity to commit crimes."

> A three-part analysis is required before other crimes evidence is admitted. First, the court must determine whether the evidence fits into one or more of the exceptions [in Rule 5-404(b)]. This is a legal determination. Second, it must be shown by "clear and convincing" evidence that the defendant engaged in the alleged criminal acts. In this regard, "[w]e review the trial court's decision to determine if there is sufficient evidence to support" its finding. Third, the court must find that the probative value of the evidence outweighs any unfair prejudice. "This determination involves the exercise of discretion by the trial court."

*Darling v. State*, 232 Md. App. 430, 462–63 (2017) (quoting from *Hurst*, 400 Md. at 406; *Sifrit v. State*, 383 Md. 116, 133 (2004); and *State v. Faulkner*, 314 Md. 630, 634 (1989)).

**B. The Record**

14

Before trial, the State moved to admit evidence that on December 9, 2014, appellant assaulted his father Stephen, whose 911 call summoned police to intervene in their dispute. At the hearing on that motion, the State proffered that Detective Kimberly Starr responded to the house after Stephen called 911 but the "call got cut off." Appellant was "screaming" at his father, who reported that appellant had "jumped" him while he was sleeping, ripped the alarm off the wall, and broken his cell phone and glasses. Appellant was arrested and charged with assault, but when he "was brought into court in early January of 2015," Stephen declined to press charges.

The prosecutor argued that evidence regarding the December 9 incident should be admitted under Rule 5-404(b). The State's theory as to special relevance was that these events showing a history of physical and verbal assaults against Stephen demonstrated a continuously "building anger" by appellant toward his father, that Stephen's fear of appellant "speaks to identity in the context of who would have done this[,]" and that appellant's familiarity with the electrical system in the house during that altercation was relevant because the power was cut off when police discovered Stephen's body.

Defense counsel conceded that "it may fall under motive" but challenged whether there was sufficient evidence. In support, counsel pointed out that Stephen called 911 merely to complain that appellant refused to turn down his music volume, that Stephen never wanted appellant to be arrested, and that Stephen told the prosecutor that the police report was not correct. Although Stephen reported that appellant jumped on him while he was in bed, appellant claimed he merely shook his father because Stephen was not waking up after taking a "heavy cocktail of Ambien." When the criminal case went to court in

15

January of 2015, Stephen indicated that he did not want to proceed with the charges against his son.

The motion court ruled that the December 9 incident was admissible under Rule 5-404(b), as evidence with special relevance in establishing motive, intent, identity, and consciousness of guilt. The court concluded that the State had established clear and convincing evidence of the incident and that its probative value outweighed any unfair prejudice. At trial, the court granted appellant a continuing objection "to the admission of anything having to do with" that incident.

## C. Appellant's Challenge

Invoking all three prongs of the test for admitting "other crimes" evidence under Rule 5-404(b), appellant contends that the trial court erred in allowing the State to introduce evidence about the December 9 incident, because it lacked special relevance, was not proved to a clear and convincing evidence standard, and was unfairly prejudicial. We address these contentions in turn, explaining why neither the record nor the law supports them.

### 1. Special Relevance

Appellant first disputes the motion court's ruling that evidence of the December 9 incident had special relevance in establishing motive, intent, identity, and consciousness of guilt. Acknowledging that "[e]vidence of other crimes introduced to establish a defendant's identity may be generally admissible under certain proscribed and sharply limited circumstances[,]" he argues that "the identity exception . . . has become somewhat amorphous and confusing" because, as the Court of Appeals has recognized, "many courts

16

appear to have used the identity exception as a sort of catch-all clause which is mixed into other exceptions or delineated separately depending on the needs of that court in a given case." *Cross v. State,* 282 Md. 468, 477 (1978). In appellant's view, "[t]he fact that Stephen and his son had a dispute in which there were no physical injuries and only yelling was witnessed did not establish that appellant was the person who committed the murder of Stephen at the end of January of 2015."

The State counters that "[t]he trial court properly admitted this evidence as it was relevant to show a pattern of abuse and difficulties, which in turn demonstrated appellant's motive and intent in killing his father." In turn, because "motive is the 'catalyst that provides the reasons for a person to engage in criminal activity[,]' *Snyder v. State*, 361 Md. 580, 604 (2000)[,] . . . the presence of a motive can make the existence of ultimate facts, like identity and intent, more likely."

We agree that evidence of this prior verbal and physical altercation had special relevance in establishing appellant's motive, intent, and derivatively, his identity. *Bryant v. State*, 207 Md. 565, 586 (1955), and its progeny are instructive here. In *Bryant*, the State presented evidence that one month before the victim was murdered, the defendant was convicted of twice assaulting her. *See id.* at 572, 586. The Court of Appeals held that evidence of prior assaults of the victim by the accused was "admissible . . . to prove the intent" to kill. *Id.* at 586.

Similarly, the Court recognized in *Snyder,* 361 Md. at 605, that "[e]vidence of previous quarrels and difficulties between a victim and a defendant is generally admissible to show motive." "To be admissible as evidence of motive, however, the prior conduct

17

must be committed within such time, or show such relationship to the main charge, as to make connection obvious, . . . that is to say they are so linked in point of time or circumstances as to show intent or motive." *Id.* (quotation marks and citation omitted). The evidence in that case had special relevance because it showed "a long course of ill treatment of the deceased by the accused; that they frequently quarreled and, although they renewed relationships at various times, there was almost a continuous state of hostility between them." *Id.* at 605-06. Relying on *Bryant*, the Court in *Snyder* held that evidence of prior altercations between the victim and the defendant "were so closely connected to the offense charged as to be evidence as to the intent and motive of the accused in [that] case.'" *Id.* at 604–05.

This Court has applied these principles in affirming admission of other crimes evidence under comparable circumstances. *See, e.g., Jackson v. State*, 230 Md. App. 450, 461 (2016) (holding evidence of prior incidents of domestic violence had special relevance to show "the exertion of control over the victim through the perpetration of a cycle of violence" that established a motive for murder); *Stevenson v. State*, 222 Md. App. 118, 150 (2015) (evidence of recent "physically abusive acts" against victim had special relevance in showing motive because such evidence "'was probative of a continuing hostility and animosity'" toward victim, "not simply the propensity to commit murder") (quoting *Snyder*, 361 Md. at 608–09). In turn, we have recognized that evidence showing "that a particular person has a motive to commit an act also tends to identify that person as the perpetrator." 5 Lynn McLain, *Maryland Evidence, State & Fed.,* § 404:11 (Sept. 2019 update available on Westlaw). *See, e.g., Wilder v. State*, 191 Md. App. 319, 344 (2010)

18

(in prosecution for first-degree assault, "[t]estimony that Wilder had earlier threatened to come to the house with a weapon ha[d] special relevance to establishing the identity of the shooter in this case, and it is also relevant to Wilder's motive for revenge against" the victims).

The State argues that, as in *Snyder* and *Jackson*, "evidence that appellant had previously assaulted his father was relevant to show motive, *i.e.*, that there was an acrimonious relationship or a prior history of abuse between appellant and his father." We agree that evidence of the recent altercation between father and son, involving animosity boiling over into verbal and physical assault, requiring police intervention during which Stephen reported that he was afraid of appellant, was relevant as evidence of motive, intent, and identity. The evidence had special relevance in establishing "a continuing hostility and animosity toward" Stephen, when viewed in light of appellant's own statements to police that he and his father had a contentious relationship, that they argued on the night Stephen was last known to be alive, and that appellant left the house immediately after that argument. *See Stevenson*, 222 Md. App. at 150.[7]

### 2. Clear and Convincing Evidence

Appellant next argues that the court erred in finding that there was clear and convincing evidence of the December 9 incident because there was "a dispute as to the actual facts of what happened[.]" The State, pointing to appellant's admissions to police

---

[7] We need not and do not address consciousness of guilt as grounds for the finding of special relevance. *See generally State v. Phillips*, 210 Md. App. 239, 270 (2013) (appellate court may affirm on any ground presented to motion court).

and in jail calls, counters that "[t]here was ample evidence from which the circuit court could conclude by clear and convincing evidence that [appellant] assaulted his father on December 9."

The record supports the motion court's determination that the proffered evidence about the December 9 altercation was clear and convincing. Police responded to Stephen Vaise's "cut off" call for assistance. Stephen reported to Detective Starr that while he was sleeping, appellant came into his bedroom and jumped on top of him, triggering an intense argument during which appellant attempted to silence his father, by ending the 911 call and disabling his cell phone, landline, and alarm system. According to the detective's proffered testimony, the 911 was a "hang-up," Stephen's cell phone and eyeglasses were broken, the alarm panel was ripped off the wall, and the landline phone was missing.

In addition, Starr allegedly witnessed appellant "screaming at both the victim and officers" and becoming so agitated that he was "getting [in] the face of" the detective. Stephen appeared frightened and expressly confirmed to the officer that he was afraid of his son. The detective arrested appellant to ensure Stephen's safety.[8] Moreover, appellant admitted physical contact with his father, in statements to police and recorded calls from jail, but attempted to downplay it as merely shaking his father to wake him up.

We conclude there is substantial evidence to support the court's determination that there was clear and convincing evidence regarding the December 9 altercation. The fact

---

[8] As detailed in our background section, Detective Starr's trial testimony was consistent with this proffer.

that after the assault occurred, Stephen elected not to pursue changes against his son did not preclude that determination.

### 3. Unfair Prejudice

With respect to the final Rule 5-404(b) factor, appellant contends that "any probative value" of the evidence regarding the December 9 altercation "was substantially outweighed by the danger of unfair prejudice." Given that he "was on trial for a violent crime" that occurred in late January 2015, and that "[t]he State's case was entirely circumstantial[,]" appellant maintains the "evidence that [he] had possibly assaulted Stephen" on December 9, 2014, did nothing to establish the identity of Stephen's killer, but instead, "suggested that he was a violent person, and created the danger that the jury would view this as evidence of a propensity to commit acts of violence." In light of this risk, he argues, the challenged evidence "was highly prejudicial," with "no legitimate probative value."

The State responds that "[t]he motions court was well within its discretion in determining that the probative value of the bad acts evidence was not substantially outweighed by any unfair prejudice." "Moreover," the State argues, "the trial court reduced the risk that the jury might engage in bad character reasoning by giving a proper limiting instruction to the jury."

We are not persuaded by appellant's contention that the December 9 incident was so remote in time or circumstances that the jury could not fairly rely on it as evidence of motive, intent, and identity in the January 26 shooting of Stephen Vaise. As discussed, the jury could reasonably infer, from appellant's own statements regarding his combative

21

relationship with his father, including that they fought when appellant last saw him alive on January 26, that appellant's hostility and violence toward his father during the December 9 altercation continued after the assault charges were dismissed in January, erupting during their January 26 altercation. *Cf. Snyder*, 361 Md. at 657 (affirming admission of evidence showing "a long course of ill treatment of the deceased by the accused; that they frequently quarreled and, although they renewed relationship at various times, there was almost a continuous state of hostility between them").

Because other crimes evidence is quintessentially prejudicial, the court correctly required a showing of "*undue* prejudice likely to result from its admission." *See Faulkner,* 314 Md. at 635 (emphasis added). By giving the following limiting instruction, moreover, the court expressly prohibited the jury from drawing an impermissible propensity inference:

> You have . . . heard evidence that the Defendant was arrested for assault in the second degree of his father on December 9, 2014, which is not a charge in this case. You may consider this evidence only on the question of motive, intent, opportunity or knowledge. However, you may not consider this evidence for any other purpose. Specifically, you may not consider it as evidence that the Defendant is a bad character or has a tendency to commit crime.

Though prejudicial, evidence of the December 9 altercation was not unfairly so, because of its special relevance in showing motive, intent, and identity in Stephen's murder. In these circumstances, the motion court did not err or abuse its discretion in admitting such "other crimes" evidence.

## II. Speedy Trial

22

Appellant contends that he was denied his right to a speedy trial by a series of eleven postponements that delayed his trial for thirty-one months after his arrest. Based on our independent examination of the record, we hold that, although the delay clearly was of constitutional dimension, appellant was not denied his right to a speedy trial, given the nature and circumstances surrounding the postponements, particularly the delay attributable to his belated NCR plea, and the lack of prejudice to appellant's defense.

## A. Standards Governing Review of Speedy Trial Challenge

Maryland courts have

> consistently applied the four factor balancing test announced by the U.S. Supreme Court in *Barker* [*v. Wingo*, 407 U.S. 514, 92 S. Ct. 2182 (1972)] to address allegations that a defendant's right to a speedy trial, as provided by the Sixth Amendment of the United States Constitution and Article 21 of the Maryland Declaration of Rights, has been violated. In *Barker,* the Supreme Court rejected a bright-line rule to determine whether a defendant's right to a speedy trial had been violated, and instead adopted "a balancing test, in which the conduct of both the prosecution and the defendant are weighed." *Barker,* 407 U.S. at 530, 92 S. Ct. at 2191–92. The Court identified four factors to be used in determining whether a defendant's right to a speedy trial has been violated: "Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Id.* at 530, 92 S. Ct. at 2192. None of these factors are "either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant."

*State v. Kanneh*, 403 Md. 678, 687–88 (2008) (some citations omitted). *See also Vermont v. Brillon*, 556 U.S. 81, 89–90, 129 S. Ct. 1283, 1290 (2009) (reaffirming the analytical framework established by *Barker*).

In reviewing the denial of a motion to dismiss for lack of a speedy trial, "we make our own independent constitutional analysis." *Glover v. State,* 368 Md. 211, 220 (2002).

23

In other words, "[w]e perform a *de novo* constitutional appraisal in light of the particular facts of the case at hand; in so doing, we accept a lower court's findings of fact unless clearly erroneous." *Id.* at 221. "Appellate review should be practical, not illusionary, realistic, not theoretical, and tightly prescribed, not reaching beyond the peculiar facts of the particular case." *Peters v. State*, 224 Md. App. 306, 359 (2015) (quoting *Brown v. State*, 153 Md. App. 544, 556 (2003), and *State v. Bailey*, 319 Md. 392, 415 (1990)) (internal quotation marks omitted).

## B. The Record

The record pertinent to this speedy trial challenge is set forth in the following time line, with postponements shown in bold type.

February 20, 2015    ARREST

March 30, 2015    DEFENSE COUNSEL'S ENTRY OF APPEARANCE + SPEEDY TRIAL DEMAND

April 16, 2015    DEFENDANT'S FIRST APPEARANCE
Appellant's trial was scheduled for June 16, 2015.

**June 16, 2015**    **FIRST POSTPONEMENT – 55 DAYS – JOINT**
Hearing at which postponement request by "all" was granted. New trial date: August 10, 2015, before the *Hicks* deadline of September 26, 2015. Reasons: "Def needs further investigation," "Defense attorney unavailable," "New State's evidence," "Discovery just provided by State."

**August 7, 2015**    **SECOND POSTPONEMENT – 93 DAYS – DEFENSE**
Hearing at which defense counsel's advance request to postpone was granted. New trial date: November 11, 2015. Reason: Per defense counsel, "it's not ready to be tried yet. There's a lot of complicating factors, including I'm having him properly evaluated by a private psychiatrist[.]" No opposition by State.

24

September 26, 2015 *HICKS* DATE.[9]

**October 22, 2015**  **THIRD POSTPONEMENT – 26 DAYS – JOINT**
Hearing at which joint request to postpone for "further investigation" was granted. New trial date: December 7, 2015. Reasons: Newly assigned prosecutor and defense attorney scheduling conflict.

**December 7, 2015**  **FOURTH POSTPONEMENT – 57 DAYS – STATE – NO DEFENSE OBJECTION**
Hearing at which the State's request to postpone was granted. New trial date: February 2, 2016. Reasons: The prosecutor cited "an outstanding forensic biology report" regarding blood evidence and the existence of "a potential witness" "who is presently incarcerated" that the State was "trying to set up a proffer session with." Defense counsel stated, "we are actually not objecting. We just ask that the . . . postponement be charged to the State."

**January 28, 2016**  **FIFTH POSTPONEMENT – 58 DAYS – JOINT**
Hearing at which the State's advance request to postpone was joined by defense counsel, then granted. New trial date: March 31, 2016. Reasons: The prosecutor cited a material police witness who was on family medical leave, and the need to interview an inmate witness. Defense counsel joined the request, stating "Mr. Vaise has some pretty pervasive mental health issues. I retained a private expert to evaluate him, and through no fault of our own, we've had to reschedule several times." Defense counsel asked for a date "as far in advance as we can because of the nature of the case."

**March 24, 2016**  **SIXTH POSTPONEMENT – 81 DAYS – STATE – NO DEFENSE OBJECTION**
Hearing at which the State's advance request to postpone was granted. New trial date: June 20, 2016, specially set. Reason: Prosecutor unavailable. The court noted that both the defendant and the State

---

[9] Md. Code, § 6-103(a)(2) of the Criminal Procedure Article and Maryland Rule 4-271(a) both require a criminal defendant to be brought to trial within 180 days after the earlier of the defendant's first appearance in circuit court or the appearance of defense counsel, unless the administrative judge finds "good cause" for a postponement. In *State v. Hicks*, 285 Md. 310, 318 (1979), the Court of Appeals held that charges must be dismissed if the State fails to establish good cause for trying the defendant after this 180-day deadline, which has become known as the "*Hicks* date." *See State v. Huntley*, 411 Md. 288, 298 (2009); *Peters v. State*, 224 Md. App. 306, 356 (2015).

requested a specially set trial date because trial could not be completed within the allotted dates calendared by the court and the prosecutor was not available beyond those dates. The court noted "No opp" from the defendant.

May 19, 2016   PLEA CHANGE, TO "NOT COMPETENT TO STAND TRIAL" AND "NOT CRIMINALLY RESPONSIBLE BY REASON OF INSANITY"
Notice filed that appellant was committed to the Department of Health and Mental Hygiene for evaluation of his competency and criminal responsibility.

**June 14, 2016**   **SEVENTH POSTPONEMENT – 106 DAYS – DEFENSE**
Hearing at which defense request for postponement was granted. New trial date: October 4, 2016. Reasons: "Due to new developments in the case, Defense counsel felt it imperative to file an NCR motion. Defense requesting this matter be removed from specially set docket." Defense counsel proffered to the court that "some issues arose that caused me to reconsider filing an NCR" and after doing so, "Court Medical contacted [counsel] last night via E-mail indicating that Mr. Vaise needed further inpatient evaluation for criminal responsibility. He was transported yesterday to Perkins Hospital and they're asking for at least 60 more days." The prosecutor stated that "[t]he State would not object" but "was intending and ready to go forward on Monday, the 20th."

June 22, 2016   ORDER FOR EXTENDED COMMITMENT TO THE DEPARTMENT OF HEALTH AND MENTAL HYGIENE FOR EXAMINATION AS TO CRIMINAL RESPONSIBILITY, extending appellant's commitment for 60 days.

August 22, 2016   ORDER FOR EXTENDED COMMITMENT AND SCHEDULING ORDER SPECIALLY SETTING TRIAL DATE FOR OCTOBER 4, 2016.

**Sept. 14, 2016**   **EIGHTH POSTPONEMENT – 97 DAYS – DEFENSE**
Hearing at which defense request for postponement granted. New trial date: January 9, 2017. Reasons: NCR evaluation and competency evaluation were not complete. The court noted the State was not objecting.

| October 12, 2016 | REPORT ISSUED BY DR. SQUARE CONCLUDING APPELLANT WAS NOT CRIMINALLY RESPONSIBLE AT THE TIME OF THE CRIME. |
|---|---|

| October 19, 2016 | STATUS HEARING ON NCR EVALUATION |
|---|---|

The prosecutor advised that "we recently received the opinion from the Department . . . and Clifton T. Perkins, specifically." Although "the State had some questions and concerns about the finding and opinion that Mr. Vaise is not criminally responsible[,]" the prosecutor was "in the process of having a meeting with the doctor so that we can discuss the report. And depending upon results of that meeting will determine the next step at least for the State."

| **Dec. 13, 2016** | **NINTH POSTPONEMENT -- 86 DAYS – JOINT** |
|---|---|

Hearing at which joint request for postponement was granted. New trial date: April 5, 2017. Reasons: The prosecutor stated that after the NCR

> report was generated in October[,] [t]he State has had an opportunity to meet with both of the forensic psychiatrists with Clifton T. Perkins on December the 2nd. The State is not in agreement with the NCR diagnostic opinion. The State did supplement both forensic psychiatrists with supplemental information that the State inquired as to whether or not they would reassess their initial opinion. They were open to same, but did advise the State that any such assessment could be done towards the tail end of January. And that is when the 12 conclusory findings would be disclosed to both counsel and I. As such, either way, my front office has been in discussions with the possibility of hiring an outside expert, depending on whatever the findings are. If they stay with them, that's one thing, but it's also my understanding from counsel I'm going to speak with her but if the NCR does change to the defendant being criminally responsible, . . . counsel may also seek an outside expert, as well, to take a review of this.

Defense counsel responded: "That's correct. We've actually retained one, but he has not generated any sort of opinions[.]" He anticipated that "we're headed toward a contested NCR hearing prior to this trial."

The court postponed "by agreement of the parties until April the 5th."

27

January 24, 2017    ADDENDUM REPORT ISSUED BY DR. SQUARE, AFFIRMING PRIOR OPINION THAT APPELLANT WAS NOT CRIMINALLY RESPONSIBLE AT THE TIME OF THE CRIME.

**March 27, 2017    TENTH POSTPONEMENT – 159 DAYS – STATE – DEFENSE OBJECTION**
Hearing at which State's advance request for advance postponement after retaining a forensic psychiatry expert to evaluate appellant was granted. New trial date: September 11, 2017, specially set.

Reasons: Defense counsel explained that she initially did not "think [appellant] was incompetent" so she "didn't file at that time." When she "later came into possession of some more privileged information, which [she was] not at liberty to disclose," that caused [her] to immediately file a "not criminally responsible" plea." Conceding that "the NCR was filed late," she argued that "once . . . the reports started coming back, the rest of the delay has all been State-initiated." Noting that she was in a unique position given that the State's own doctors at Perkins diagnosed appellant as NCR, defense counsel did not know whether to object because she had "no way of knowing" what the newly retained State expert's opinion is going to be" or "whether I need to hire my own expert, if we're going to have a contested NCR hearing" and if so, whether it would "be a bifurcated proceeding."

The prosecutor reported that "the State vehemently feels that this is an incorrect opinion by Perkins." He had been directed, for "fiscal purposes," to have the Perkins psychiatrists review their NCR diagnosis based on "additional documentation" including "hours and hours of jail calls made by the defendant outside of the facility he was being held" in and crime scene photos. After those experts issued their addendum report on January 24, again finding appellant NCR, the State retained a forensic psychiatrist, about 30 days earlier, "to review the two initial reports." The previous week, the prosecutor had obtained authorization "for the full retention of a forensic psychiatrist to examine everything in this case." "The earliest date" on which his report could be available "would be September the 11th[.]"

The court, noting "the defendant's objection[,]" granted the postponement and ordered the new trial be specially set, explaining that appellant "would have a much stronger argument if we hadn't been delayed about [fourteen months] before you even filed the NCR plea."

28

When the prosecutor estimated trial would take ten days, defense counsel added, "If it's a contested NCR, it may be longer than that."

June 26, 2017    STATE'S MOTION FOR MENTAL EXAMINATION OF DEFENDANT BY EXPERT IN FORENSIC PSYCHIATRY.

July 29, 2017    REPORT OF STATE'S PSYCHIATRIST, CONCLUDING THAT APPELLANT WAS NOT NCR, PROVIDED TO DEFENSE COUNSEL.

August 21, 2017    DEFENSE MOTION TO DISMISS WITH PREJUDICE FOR LACK OF SPEEDY TRIAL.

**Sept. 8, 2017**    HEARING AT WHICH DEFENSE MOTION TO DISMISS FOR LACK OF SPEEDY TRIAL WAS DENIED.

**ELEVENTH POSTPONEMENT – 119 DAYS – JOINT**
Hearing at which trial was postponed because the parties agreed more days than the number calendared by the court would be necessary to try both guilt on the charges and appellant's criminal responsibility. New trial date: January 8, 2018, specially set for three weeks.

January 8, 2018    RENEWED SPEEDY TRIAL MOTION DENIED. FIRST TRIAL BEGINS.

January 25, 2018    MISTRIAL DECLARED. New trial scheduled to begin May 7, 2018.

May 7, 2018    RENEWED DEFENSE MOTION TO DISMISS FOR LACK OF SPEEDY TRIAL. SECOND TRIAL BEGINS.

May 22, 2018    MOTION TO DISMISS DENIED. DEFENDANT CONVICTED.

### C. Appellant's Challenge

Appellant contends the delay between his evaluation for criminal responsibility and his trial violated his right to a speedy trial. Examining the record through the analytical framework established by *Barker,* we disagree.

### 1. Length of the Delay

"[F]or purposes of a speedy trial analysis, the length of the delay is measured from the date of arrest." *Kanneh*, 403 Md. at 688. This delay is both a factor in the *Barker* balancing formula and "a triggering mechanism[,]" because it is only when a delay is long enough to be "presumptively prejudicial" that it creates "the necessity for inquiry into the other factors that go into the balance." *Barker*, 407 U.S. at 530–31, 92 S. Ct. at 2192. *See Kanneh,* 403 Md. at 688. Although there is no numerical measure for when a defendant's right to a speedy trial has been violated, a delay of more than one year typically triggers "the balancing analysis required under *Barker*." *Kanneh*, 403 Md. at 688.

When evaluating the length of a particular delay as a factor in the overall "*Barker* balance," courts must consider the nature of the case. *See id.* The longer the delay and the less complex the trial, the more the delay will weigh in favor of the defendant. *See Divver v. State,* 356 Md. 379, 390–91 (1999). For example, "the delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge." *Barker*, 407 U.S. at 531, 92 S. Ct. at 2192. *Cf., e.g., Divver,* 356 Md. at 389–91 (twelve-month delay in a "run of the mill District Court case" on driving under the influence charges "operates more heavily in [defendant's] favor than would usually be the case in many circuit court prosecutions"). Nevertheless,

> [t]he length of delay, in and of itself, is not a weighty factor, but rather the duration of the delay is closely correlated to the other factors, such as the reasonableness of the State's explanation for the delay, the likelihood that the delay may cause the defendant to more pronouncedly assert his speedy trial right, and the presumption that a longer delay may cause the defendant greater harm.

*Glover,* 368 Md. at 225. *See Kanneh*, 403 Md. at 689.

30

Appellant points to the lengthy delay "between the date on which [he] was arrested, and the date on which the motion to dismiss for a violation of his right to a speedy trial was heard." Although he does not challenge pre-NCR evaluation delay, he characterizes the State's delay in evaluating him as "unjustified." In his view, the prosecutor's delay "in meeting with the first doctors who evaluated" appellant and "in retaining an expert witness[,]" make the State "fully responsible for each delay after October of 2016[,]" when Dr. Square filed her NCR report. That "one year and three month delay[,]" from the NCR plea on May 19, 2016, until "the first trial began in January of 2018, should weigh heavily against the State." Given such "significant and unjustifiable delay[,]" appellant contends that "the motions court erred in reaching the conclusion that [his] right to a speedy trial was not violated."

To be sure, the lengthy delay in bringing this case to trial requires close scrutiny. Indeed, the total period between appellant's arrest on February 20, 2015, until his first trial commencing on January 8, 2018, was 1,053 days or more than thirty-four months. Clearly, this delay is of constitutional dimension, requiring "*Barker* balancing." *See, e.g., Randall v. State*, 223 Md. App. 519, 544–45 (2015) (twenty-five-month delay was presumptively prejudicial, triggering a *Barker* review); *Jules v. State*, 171 Md. App. 458, 482–83 (2006) (sixteen-month delay triggered *Barker* review).

Yet the fact that this delay is long enough to trigger a *Barker* inquiry does not, absent more, require dismissal. Indeed, the length of the delay, by itself, "is the least determinative of the four factors that we consider in analyzing whether [a defendant's] right to speedy trial has been violated." *Kanneh,* 403 Md. at 690. For this reason, other delays comparable

31

to the one experienced by appellant have been held not to violate the right to a speedy trial. *Cf., e.g., Barker*, 407 U.S. at 534–35, 92 S. Ct. at 2194–95 (five-year delay did not violate speedy trial right, because the defendant suffered minimal prejudice and did not ask for a speedy trial); *Kanneh,* 403 Md. at 689–90 (thirty-five months). *See also Howard v. State*, 440 Md. 427, 447 (2014) (twenty-five months); *Randall,* 223 Md. App. at 544, 554–56 (twenty-five months); *Malik v. State,* 152 Md. App. 305, 317–18 (twenty-three months); *Marks v. State,* 84 Md. App. 269, 282 (1990) (twenty-two months).

The record establishes that this was a complicated murder case involving a defendant whose criminal responsibility was in question after he entered an NCR plea sixteen months into the parties' trial preparation, when the State was prepared to proceed to trial. We do not treat the four-month period between the arrest and the first scheduled trial date as delay for purposes of our *Barker* analysis (from February 23, 2015, until June 16, 2015), because it is neutral and effectively "excluded from our calculations," on the ground that it was "necessary for the orderly administration of justice[.]" *Howell v. State*, 87 Md. App. 57, 82 (1991). *See also Lloyd v. State*, 207 Md. App. 322, 330–31 (2011) (period until first trial date is neutral). From that first trial date, until the change in appellant's plea (i.e., from June 16, 2015, until May 19, 2016), the parties prepared for trial while mutually seeking and/or acquiescing in six postponements attributed to calendaring and investigatory concerns. As appellant acknowledges, this portion of the delay in bringing his case to trial is not the focus of our speedy trial analysis because the State was

32

prepared to go to trial before appellant's NCR plea paused and then re-set the proverbial clock on trial preparation.[10]

Consequently, as appellant suggests, our analysis of the length of the delay focuses on the period after the entry of the NCR plea on May 19, 2016, until appellant's first trial began on January 8, 2018, a period of nearly 20 months/599 days, during which there were four more postponements. Because the length of that delay is best evaluated in conjunction with the reasons for it, we shall examine these two factors together as they relate to each of the relevant postponements. *See Glover*, 368 Md. at 225.

### 2. Reasons for Delays

> Closely related to length of delay is the reason the government assigns to justify the delay. Here, too, different weights should be assigned to different reasons. A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay.

*Barker*, 407 U.S. at 531, 92 S. Ct. at 2192.

---

[10] Three of those pre-NCR plea postponements (the first, third, and fifth), totaling four and a half months/139 days, were joint and therefore neutral in weight. *See generally Howard*, 440 Md. at 448–49 (jointly caused delay was neutral); *Glover*, 368 Md. at 225–26 (joint postponement resulted "from dual factors"); *Marks*, 84 Md. App. at 283 (joint request for continuance is neutral and not chargeable to either party). One postponement of 93 days (the second) was attributed to the defense after defense counsel advised that she was "not ready yet" and was having appellant examined by a psychiatrist. Two more pre-NCR plea postponements, totaling 138 days (the fourth and sixth) were requested by the State, without defense objection. As appellant has acknowledged, none of those early postponements unreasonably delayed trial of this complex murder case involving forensic evidence and multiple witnesses, which ultimately took six days to try on guilt and another six days to try on criminal responsibility.

33

As noted, after six postponements appellant changed his plea to NCR, then asked for the next two postponements, totaling 203 days, in order to facilitate evaluation of appellant's competency and criminal responsibility. The NCR plea triggered further investigation and preparation by counsel for both appellant and the State, ultimately generating a contested trial on criminal responsibility. Collectively, the post-NCR postponements requested by the defense, for itself and jointly with the State (*i.e*, the seventh, eighth, and ninth postponements, from June 20, 2016, to October 4, 2016, to January 9, 2017, to April 5, 2017) totaled more than nine and a half months/289 days. Following Dr. Square's NCR report on October 12, 2016, and her reevaluation report filed on January 24, 2017, the State sought another evaluation by a different forensic psychiatrist. The next postponement (*i.e.,* the tenth, from April 5, 2017, to September 11, 2017) added another five plus months/159 days, for the State's expert to perform an independent evaluation of appellant's criminal responsibility.[11]

According to appellant, the extra time granted to the State for its investigation crossed the Sixth Amendment threshold for a speedy trial. We disagree.

Appellant relies on *Chance v. State,* 45 Md. App. 521, 523 (1980), in which an insanity plea was followed by an order to evaluate the defendant. Trial was postponed when that evaluation took four months, rather than the statutorily prescribed sixty days. *Id.* Concluding that "[t]he first 2 months within which a report must be submitted

---

[11] The final postponement resulted solely from a calendaring problem, when defense counsel and the prosecutor advised the court that they anticipated that the bifurcated trial would last up to three weeks, instead of the two weeks specially set by the court.

34

by the State" under the statutory mandate "is 'neutral and reasonable,'" this Court held that "[t]he following 2 months are unexplained and chargeable to the State which is responsible for the delay in reporting as well as for bringing defendant to trial." *Id.* (internal citations omitted).

Since our decision in *Chance*, the Court of Appeals has declined, for *Hicks* purposes,[12] to charge postponements triggered by a post-plea investigation of criminal responsibility against either the defense or the State. In *Goins v. State*, 293 Md. 97, 107 n.7 (1982), the Court of Appeals, addressing a juvenile who entered an insanity plea, noted that

> the delay in this case was due entirely to the length of time it necessarily took two executive branch agencies of the State government (the Juvenile Services Administration and the Clifton T. Perkins Hospital Center) to perform their statutory functions. The delay was not attributable to the court, the State's Attorney's office, or the defendant.

Likewise, in *Carey v. State*, 299 Md. 17, 22 (1984), the Court held that an order for hospital examination and report for a defendant who entered an insanity plea "necessarily postponed the trial date" for *Hicks* purposes, because "'trial could not commence until the receipt of the report on the defendant's mental competency to stand trial and his mental condition at the time of the alleged offenses.'" *Id.* at 22 (quoting *Goins*, 293 Md. at 111).

When arguing the speedy trial motion, defense counsel recounted what happened when the State was "granted the time" after receiving the NCR report in October 2016, as follows:

---

[12] *See infra* note 8.

35

[T]he matter was rescheduled in mental health court for November the 30th. We appeared back in mental health – we – that caused us to postpone the matter. We appeared back in mental health court for November the 30th, at which time the State had indicated that they hadn't had time to coordinate with Drs. Square and Hanson and hadn't met with them yet. That caused the matter to be postponed again.

And then after that, the – Drs. Square and Hanson, in the interim, submitted another report on January the 24th after going over everything that the State provided to them as well as meeting again with the Defendant, and entered and submitted a report indicating that they still believed that the Defendant was not criminally responsible in this matter, at which time the State indicated, shortly after receiving the report, which was, I think, January the 24th of 2017, that they would be retaining a private expert.

When we appeared in Court on March the 27th, 2017, for an advance postponement filed by the State, it was because the State had not yet retained their expert, two months after indicating that they were planning on retaining one. And at that point the matter was postponed again and specially set for September the 11th. This is the fifth time today, I think, that this matter's been specially set.

When we appeared on September the 11th [sic] we have just received Dr. Ratner's report, maybe about a month prior, maybe a month and a half prior. . . .

I think it was the end of – like, July 29th, if I remember . . . .

So then we appeared on September the 11th and argued this motion[.]

In this Court, appellant maintains that the State's request to postpone trial in order to conduct its psychiatric evaluation was "unjustified." Pointing out that "the initial report" prepared by Dr. Square "was submitted to the court in October of 2016[,]" appellant complains that "instead of proceeding promptly to trial upon the completion of the evaluation, the State postponed the case to meet with the doctors; the State postponed the case again because they had not yet met with the doctors; the State postponed the case again to retain an expert." In appellant's view, these delays shifted full responsibility for

36

"the one year and three month delay from October of 2016 to when the first trial began in January of 2018," to the State, and such delay "should weigh heavily against the State" because "when a delay is necessitated by the failure of the State to prepare its case, that delay weighs heavily against [the State]." *Wheeler v. State,* 88 Md. App. 512, 520 (1991).

Neither the record, nor the law supports weighing the entire delay following Dr. Square's NCR report heavily against the State. Applying lessons from *Carey* and *Goins*, we conclude that delay following an NCR plea, when attributable to affording the parties' a reasonable opportunity to conduct an expert evaluation of a defendant's criminal responsibility, may be treated as a neutral factor in our *Barker* speedy trial analysis. As the motion court recognized, this reflects that

> [w]henever there's an NCR request in the mix, time kind of on the one hand stands still. Even though it keeps moving for the system, it stands still for the Defendant, because it takes a turn. And no one knows how far left or right that turn may take them.
>
> There will have to be an evaluation. We don't know how long the evaluation is going to take. We don't know if evaluation A is going to lead to evaluation B. And once the evaluation is done, then we have to wait for the reports of the evaluation. And of course, whatever party requested the evaluation, the opposing party has the absolute right to have their experts evaluate the individual for their purposes.
>
> The primary reasons for the delay in this matter, the Court finds, is for the not criminally responsible as well as . . . to provide both parties the ability to put forth a complete and fair case, even if it means disclosing hundreds of hours of jail calls and then subsequently . . . narrowing it down.

Here, as detailed in our timeline, the two postponements immediately following the plea change were requested by appellant, who sought more time for NCR evaluations by Perkins psychiatrists. That delay totaled 203 days, extending the trial date from June 20,

2016, until January 9, 2017. The next postponement of 86 days resulted from a joint request while Drs. Square and Hanson were reevaluating in light of additional evidence, extending the trial date until April 5, 2017. On March 27, 2017, the State requested its first post-NCR postponement, explaining that after receiving the supplemental evaluation by Dr. Square on January 24, the prosecutor had secured approval for a full evaluation by an independent psychiatrist, then retained such an expert the previous week. Although the prosecutor proffered that the expert could deliver his report in July, defense counsel objected and asserted appellant's right to a speedy trial. The court rescheduled trial for September 11, 2017, a postponement of more than five months/159 days.

As in weighing all delays within the *Barker* analytical framework, we consider the complicated nature of this case. Appellant concedes that the initial months between appellant's arrest and the change in his plea were reasonable and ultimately neutralized by the new NCR plea. That plea change generated new trial preparation, requiring both defense counsel and prosecutors to initiate evaluations of whether appellant was competent to stand trial and criminally responsible for killing his father. *Cf. Brillon*, 556 U.S. at 93–94, 129 S. Ct. at 1292 (defendant's dismissal of counsel "on the eve of trial" "should have factored into the court's analysis of subsequent delay").

We agree with appellant that the period from the NCR plea, until Dr. Square issued her report, *i.e.,* May 19–October 12, 2016, was a presumptively reasonable period of time that does not weigh against either party because its purpose was to enable evaluation of appellant's competency and criminal responsibility. At that point, the State requested, and defense counsel expressly agreed to, a reevaluation by Drs. Square and Hanson, with trial

38

postponed until April 5, 2017. Moreover, counsel agreed in advance that whichever party might seek to contest that reevaluation would be afforded a reasonable opportunity to do so. Consequently, once the State learned, on January 24, 2017, that Drs. Square and Hanson were maintaining their NCR opinion, the prosecutor followed its protocol in retaining an independent expert then obtained a postponement to conduct that evaluation. The State's newly retained expert disagreed with the NCR diagnosis by Drs. Square and Hanson, and on July 29 issued his report concluding that appellant was criminally responsible at the time of the shooting.

Given the reasons for and the length of this NCR-related delay, we are not persuaded that it carries the heavy weight that appellant demands. To be sure, this was a highly unusual case in that the State elected to challenge the findings of two State-employed psychiatrists at Perkins. Nevertheless, as established by Dr. Hanson's testimony that clinicians could reasonably disagree about this "difficult case," and illustrated by the jury crediting Dr. Ratner's opinion in finding appellant criminally responsible, the State's request to conduct this additional review was reasonable. Because the ensuing delay was a reasonable period to obtain review of appellant's criminal responsibility by the State's expert, it is neutral in our *Barker* analysis. *See Goins*, 293 Md. at 107 n.7.

The reasonableness of these NCR-related postponements may be measured by comparing them. The continuances requested and agreed to by appellant—the seventh, eighth, and ninth postponements—occurred on June 14, 2016 (106 days); September 14, 2016 (97 days); and December 13, 2016 (86 days), totaling more than nine months/289 days. In response to Dr. Square's January 24, 2017, report, the State requested additional

39

time for an evaluation by its independently retained expert. Although the State took more time to secure its NCR evaluation,[13] the actual trial delay resulting from the two postponements requested by appellant to obtain Dr. Square's evaluations (June 16, 2016– January 9, 2017 = 203 days), was greater than the delay requested by the State to obtain Dr. Ratner's evaluation (April 5–September 11, 2017 = 159 days).

Consequently, even if we weigh this delay against the State, we conclude that it is counterbalanced by appellant's NCR-related delay. In the absence of any "gamesmanship" on the part of either prosecutor or defense counsel, we discern no reason to assign heavier weight to the postponement requested by the State than to the postponements requested by appellant. For these reasons, neither of the first two *Barker* factors—the length and reasons for the delay—weighs against the State, as appellant contends.

### 3. Assertion of the Right

When evaluating speedy trial claims, courts recognize that "[t]he more serious the deprivation, the more likely a defendant is to complain." *Barker,* 407 U.S. at 531–32, 92 S. Ct. at 2192. For that reason, a "defendant's assertion of his speedy trial right . . . is entitled to strong evidentiary weight in determining whether the defendant is being

---

[13] We acknowledge that although the actual delay resulting from appellant's postponements was longer than the delay resulting from the State's postponement, the amount of time necessary to secure an evaluation by Dr. Square (May 19–June 22, 2016 = 34 days between the plea and the commitment order) was less than the time necessary for the State to secure an evaluation by Dr. Ratner (January 24–March 20, 2017 = 55 days between the reevaluation report and retention of Dr. Ratner). Similarly, the time necessary to complete Dr. Square's initial evaluation (June 2–October 12, 2016 = 112 days between the commitment order and her report) was slightly more than the time used to obtain Dr. Ratner's evaluation (approximately March 20–July 29, 2017 = 131 days between retention and report).

deprived of the right." *Id.* Conversely, "failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial." *Id.*, 407 U.S. at 532, 92 S. Ct. at 2193. Moreover, although a defendant may initially assert the right, "his failure to assert it later at critical points undercuts his ability to rely upon his assertion of it." *Marks*, 84 Md. App. at 285.

As the record detailed above shows, appellant asserted his right to a speedy trial when defense counsel noted his appearance in March 2015, but not again for more than two years, until the hearing on March 27, 2017, when defense counsel opposed further postponement for the State to independently evaluate appellant. More than four months later, defense counsel, after receiving Dr. Ratner's report, filed appellant's first motion to dismiss on speedy trial grounds. By that time, the State was ready for trial, which was scheduled to begin September 11.

During the motion hearing, court and counsel realized that trial could not be completed within the ten day window allotted for the specially set matter. Trial was rescheduled and specially set for a three week period, beginning January 8, 2018. Defense counsel waited until trial began to renew appellant's speedy trial motion. After a mistrial resulted in a new trial being scheduled on May 7, 2018, defense counsel again awaited the first day of trial to move for a speedy trial dismissal.

Appellant's failure to assert his speedy trial demand at critical points undercuts his claim that this factor weighs in his favor. *See Marks*, 84 Md. App. at 285. After appellant's initial "boilerplate" assertion of the right, defense counsel waited another two years to object to further delay on speedy trial grounds. Even then, counsel did not file a speedy

41

trial motion for another four months. By that time, the State was prepared for trial. After a final postponement was necessary for calendaring reasons, defense counsel did not move again for speedy trial dismissal until the first day of trial. In our view, appellant's failure to assert the right in so many instances of delay "make[s] it difficult for [him] to prove that he was denied a speedy trial." *See Barker*, 407 U.S. at 532, 92 S. Ct. at 2193.

### 4. Actual Prejudice

We evaluate the final *Barker* factor, actual prejudice, in light of the three interests protected by the constitutional right to a speedy trial: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Id.*, 407 U.S. at 532, 92 S. Ct. at 2193. "Of these, the most important is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Id.* In particular, the accused's right to a speedy trial is designed to prevent problems such as "defense witnesses becoming unavailable and memories becoming faulty." *Fraiden v. State*, 85 Md. App. 231, 268 (1991). Although the "[p]assage of time . . . may impair memories, cause evidence to be lost, deprive the defendant of witnesses, and otherwise interfere with his ability to defend himself[,]" a merely theoretical "'possibility of prejudice at trial is not itself sufficient reason to wrench the Sixth Amendment from its proper context.'" *Glover*, 368 Md. at 231 (quoting *United States v. Marion*, 404 U.S. 307, 321–22, 92 S. Ct. 455, 464 (1971) (emphasis in *Glover* deleted).

Appellant has never contended his defense was actually impaired during the delay, in the sense that witnesses or other evidence became unavailable due to the passage of time.

42

*See Brady v. State*, 36 Md. App. 283, 293 (1977); *see, e.g., White v. State,* 223 Md. App. 353, 385–86 (2015) (finding no prejudice where there was no discernible "impairment to the defendant's case."). Instead, appellant claims that he was prejudiced by his lengthy pretrial incarceration. In particular, appellant maintains that "while impossible to quantify, the anxiety and concern [he] must have suffered while incarcerated and awaiting trial are not difficult to imagine."

Appellant's complaints about pretrial incarceration causing "anxiety and concern" are undercut by the record. Even though defense counsel indicated that appellant was under psychiatric evaluation as early as August 17, 2015, appellant offered "no specific testimony that [he] suffered any anxiety" or distress "beyond that which is expected when charges are pending[.]" *See Marks,* 84 Md. App. at 286.

Moreover, this Court has "considered a defendant's conscious choice to endure further the anxiety and risk of impairment to his or her defense by requesting continuances in weighing the prejudice caused to a defendant by continuances." *Id.* at 285–86. Before entering his NCR plea, appellant requested, individually or jointly, four postponements, amounting to nearly eight months of additional pretrial incarceration. After his NCR plea, even though appellant already had been incarcerated for sixteen months, he requested, individually and jointly, postponements resulting in more delay—over nine and a half months/ 289 days for the seventh, eighth, and nine postponements.

Based on this record, we may fairly infer that his pretrial incarceration was not as onerous as appellate counsel now "imagine[s]." *Cf. Malik*, 152 Md. App. at 322 (weight of defendant's pre-trial incarceration was "not as great as it would have been had [he] not

43

caused a portion of the delay"). In turn, because courts may "accord great weight to the lack of any significant prejudice resulting from the delay," *Wilson v. State,* 148 Md. App. 601, 609 (2002), this factor weighs against appellant. *See Jules*, 171 Md. App. at 488–89.

## 5. *Barker* **Balancing**

After independently weighing each of the *Barker* factors, we conclude that the delay in this case did not violate appellant's right to a speedy trial. The supporting record may be summarized as follows:

| Proceeding | Delay | Length | Reason(s) | Assertion of speedy trial right | Prejudice asserted | Requested by |
|---|---|---|---|---|---|---|
| **First Postponement June 16, 2015** | June 16 to August 10, 2015 | 55 days | Defense investigation + Defense atty unavailable + New State discovery | None (pre-*Hicks*) | None | Joint |
| **Second Postponement August 7, 2015** | August 10 to Nov. 11, 2015 | 93 days | Defense not ready + Defendant evaluated by psychiatrist | None (*Hicks* waived) | None | Defense |
| **Third Postponement Oct. 22, 2015** | Nov. 11 to Dec. 7, 2015 | 26 days | New prosecutor + defense counsel conflict | None | None | Joint |
| **Fourth Postponement Dec. 7, 2015** | Dec. 7, 2015, to Feb. 2, 2016 | 57 days | Prosecutor awaiting forensic test results + investigating new witness | None | None | State |
| **Fifth Postponement Jan. 28, 2016** | February 2 to March 31, 2016 | 58 days | State witness unavailable + Defendant under evaluation | None | None | Joint |
| **Sixth Postponement March 24, 2016** | March 31 to June 20, 2016 | 81 days | Insufficient time scheduled by court; prosecutor unavailable past scheduled dates | None | None | State |
| *Pre-NCR subtotals* | *June 16, 2015, to May 19, 2016* | *338 days* | | | | *Joint: 139 State: 138 Defense: 93* |
| *NCR Plea May 19, 2016* | | | | | | |
| **Seventh Postponement June 14, 2016** | June 20 to Oct. 4, 2016 | 106 days | NCR plea filed + Defendant committed and under evaluation | None | None | Defense |
| **Eighth Postponement Sept. 14, 2016** | Oct. 4, 2016, to Jan. 9, 2017 | 97 days | NCR evaluation continuing | None | None | Defense |
| **Ninth Postponement Dec. 13, 2016** | Jan. 9 to April 5, 2017 | 86 days | Awaiting reevaluation by Perkins psychiatrists | None | None | Joint |

| | | | | | | |
|---|---|---|---|---|---|---|
| **Tenth Postponement March 27, 2017** | April 5 to September 11, 2017 | 159 days | NCR evaluation by State psychiatrist | Speedy trial right asserted | None | State |
| *Speedy Trial Motion Aug. 21, 2017* | | | | | | |
| **Eleventh Postponement Sept. 8, 2017** | Sept. 11, 2017 to Jan. 8, 2018 | 119 days | Insufficient specially set days for trial | | | Joint |
| **First Trial Jan. 8-25, 2018** | | | | Renewed motion to dismiss | | |
| **Second Trial May 7-22, 2018** | | | | Renewed motion to dismiss | | |
| *Post-NCR subtotals* | *May 19, 2016, to January 8, 2018* | *599 days* | | | | *Joint: 216 days State: 159 days Def.: 203 days* |
| *Totals* | *June 16, 2015, to January 8, 2018* | *937 days* | | | | *Joint: 344 days State: 297 days Def.: 296 days* |

When the entire length of the NCR-related delay is viewed in the context of this complicated case, which was calendared as a specially set, three-week trial because of the dispute over appellant's criminal responsibility, we are not persuaded the State's single NCR-related postponement warrants dispositive weight in our *Barker* analysis. Although a tenth postponement of more than five months/159 days is of constitutional concern, having followed many previous delays, the motion court correctly ruled that the State was entitled to a reasonable opportunity for its expert to evaluate appellant. *See Carey*, 299 Md. at 22; *Goins*, 293 Md. at 111.

In these circumstances, we conclude that the NCR-related postponements are neutral because they afforded both parties a reasonable period to evaluate appellant's criminal responsibility. Alternatively, given the parties' mutual agreement to these evaluations, and that the State's sole NCR-related postponement did not cause as much

trial delay as the postponements requested by appellant, the length and reasons for those delays offset each other.

The remaining two factors—appellant's belated assertion of his right to a speedy trial and his showing of prejudice—weigh against him. The State was prepared to proceed to trial when appellant changed his plea, triggering the right for both defense and prosecution to evaluate appellant's criminal responsibility for his father's death. Undercutting appellant's complaint that the length of the delay attributable to the State's evaluation was unreasonable are two factors. First, defense counsel waited two years after asking for a speedy trial to object and another four months to seek dismissal. Second, the State requested less time for its independent expert to complete his evaluation and report than appellant had been granted for the Perkins experts to complete theirs. Absent any claim of actual prejudice to appellant's defense, we conclude that these two *Barker* factors weigh against appellant, tipping the *Barker* balance against a speedy trial dismissal.

Based on this record, we are satisfied that appellant was not denied his constitutional right to a speedy trial.

### III. Mistrial

In his final assignment of error, appellant contends that "the trial court erred in refusing to grant [his] motion for mistrial when the State allowed a portion of [his] statement, which was supposed to have been redacted, to be played for the jury." Reviewing the record in light of legal standards governing mistrials, we conclude the trial court did not err or abuse its discretion in denying appellant's motion.

### A. Standards Governing Review of Mistrial Motion

46

Appellate review of a decision to deny a mistrial is conducted "under the abuse of discretion standard." *Nash v. State*, 439 Md. 53, 66–67 (2014). Because "'a ruling reviewed under an abuse of discretion standard will not be reversed simply because the appellate court would not have made the same ruling[,]'" courts reviewing the denial of a mistrial afford trial judges "a wide berth." *Id.* at 67, 68 (citation omitted). Moreover, we are mindful that "declaring a mistrial is an extreme remedy not to be ordered lightly." *Id.* at 69.

Our benchmark for appellate relief "is whether 'the prejudice to the defendant was so substantial that he [or she] was deprived of a fair trial.'" *Kosh v. State*, 382 Md. 218, 226 (2004) (citation omitted). In making that assessment, we recognize:

> the trial court is peculiarly in a superior position to judge the effect of any of the alleged improper remarks. The judge is physically on the scene, able to observe matters not usually reflected in a cold record. The judge is able . . . to note the reaction of the jurors and counsel to inadmissible matters. That is to say, the judge has his finger on the pulse of the trial.

*Simmons v. State*, 436 Md. 202, 212 (2013) (quotation marks and citations omitted).

The "factors to be considered in determining whether a mistrial is required," *Washington*, 191 Md. App. at 100, include:

> whether the reference . . . was repeated or whether it was a single, isolated statement; whether the reference was solicited by counsel, or was an inadvertent and unresponsive statement; whether the witness making the reference is the principal witness upon whom the entire prosecution depends; whether credibility is a crucial issue; whether a great deal of other evidence exists[.]

*Guesfeird v. State*, 300 Md. 653, 659 (1984) (citations omitted).

When, as in this instance, inadvertent presentation of inadmissible evidence to the jury generates a request for a mistrial, we consider whether a curative instruction adequately remedied any resulting prejudice. *See Carter v. State*, 366 Md. 574, 589-90 (2001); *Rainville v. State*, 328 Md. 398, 408 (1992). Only when the inadmissible evidence is so prejudicial that it cannot be disregarded by the jury—or as courts and counsel have described such circumstances, when "the bell cannot be unrung"—will measures short of a mistrial be an inadequate remedy. *See, e.g., Quinones v. State*, 215 Md. App. 1, 23-24 (2013) ("We agree with the State's 'bell cannot be unrung' argument, which is in line with the holding of the Court of Appeals . . . [that] there comes a point when a theoretically available remedy becomes ineffective."); *Parker v. State*, 189 Md. App. 474, 495–96 (2009) ("Because this case turned upon whether the jury believed the testimony of Det. Dunkle or the contrary testimony of the defendant, '[i]t is highly probable that the [prosecutor's reference to Parker's prior conviction] had such a devastating and pervasive effect that no curative instruction, no matter how quickly and ably given, could [have] salvage[d] a fair trial for the defendant.'") (quoting *Rainville*, 328 Md. at 411). *Compare United States v. Murray*, 784 F.2d 188, 188–89 (6th Cir. 1986) (expecting jurors to disregard prosecution witness' testimony that defendant was asked to take a polygraph examination "is very close to an instruction to unring a bell"), with *Guesfeird*, 300 Md. at 656, 659 (inadvertent blurt that another witness took a lie detector test was adequately remedied by curative instruction).

*Rainville* gives us an instructive example of an inadequate corrective instruction. In that case, the defendant was on trial for sexually abusing a seven-year-old girl. *Rainville,*

328 Md. at 409.  When the prosecutor asked the victim's mother to describe the child's "demeanor when she told you about the incident[,]" the witness unexpectedly responded that her daughter "was very upset" but "came to me and she said where [the defendant] was in jail for what he had done to [the victim's brother] that she was not afraid to tell me what happened."  *Id.* at 401.  The trial court denied a mistrial and instead instructed the jury to disregard the mother's testimony regarding the alleged incident involving the brother.  *Id.* at 402.

The Court of Appeals reversed.  *Id.* at 411. Even though the prosecutor's question and the trial court's curative instruction were "appropriate," the inadmissible information was not repeated, and the mother was not the State's primary witness, nevertheless, "informing the jury" about the defendant's incarceration for a crime against another child "almost certainly had a substantial and irreversible impact upon the jurors," so that "no curative instruction, no matter how quickly and ably given, could salvage a fair trial for the defendant."  *Id.* at 410–11.

## B.  The Record

During the direct examination of Detective Raymond Hunter, the State played appellant's recorded statement from February 23, 2015.  As played for the jury, the lengthy recording mistakenly included a portion of appellant's statement that had been redacted when that statement was played at appellant's first trial.  Specifically, after appellant told the detective that he had never lost his control or hurt anyone and described how he had been shooting the rifle for practice before his father took it away, the jury was allowed to hear appellant say that he had been in trouble at seventeen with a flare gun.

49

Defense counsel requested a bench conference to move for a mistrial on the ground that the mistakenly played statement would invite the jury to speculate about what happened in this case.

> [DEFENSE COUNSEL]: I think for safety purposes I need to move for a mistrial at this point since they heard I made a mistake when I was 17 and they can only speculate about what that would be, especially since we're talking about shooting guns. In the alternative, if the [c]ourt's not willing to grant a mistrial, I would ask [for] some sort of curative instruction[.]

Court and counsel, apparently reviewing a transcript of the interview, then discussed what the jury actually heard:

> THE COURT: Okay. He said I made a mistake at 17. I heard that, then was it stopped after that?
>
> [DEFENSE COUNSEL]: Let me see what your first line says. He started saying –
>
> [PROSECUTOR]: Here, Your Honor.
>
> [DEFENSE COUNSEL]: I think we got into I was playing around, is as far as we got.
>
> [PROSECUTOR]: Think flare gun was [indiscernible].
>
> [DEFENSE COUNSEL]: Yeah, I'm not sure they heard flare gun, because that's when I was –
>
> THE COURT: When I was 17 years old?
>
> [PROSECUTOR]: I made a mistake when I was 17 years old. And then at flare gun, that's where we hit pause.
>
> THE COURT: Wait, so then did we hear I was playing around with a flare gun?
>
> [DEFENSE COUNSEL]: No, it stopped at flare gun.
>
> THE COURT: Yeah, so we heard I was playing around with a flare gun?

[PROSECUTOR]: Yeah.

After determining that the recording did not reference a shooting, the court denied the mistrial motion. Instead, the court gave the following remedial instruction:

> Madam Forelady, members of the jury, on the statement you just heard Mr. Vaise say words to the effect of I made a mistake when I was 17 years old, I was playing around with a flare gun. I am striking that from the record. You are to completely disregard it. Do not speculate as to what it means or what he was referring to. It is omitted from the record. Thank you.

### C. Appellant's Challenge

Appellant contends that he "was deprived of a fair trial" because "[t]his curative instruction was not sufficient" to remedy such "highly prejudicial information[.]" In support, he cites *Kosmas v. State,* 316 Md. 587 (1989), holding that "a single, unsolicited reference to the defendant's refusal to take a lie detector test" could not be cured by an instruction to disregard that evidence, given that "the case against Kosmas was not overwhelming and resolution of his guilt hinged upon the jury's determination of his credibility." *Id.* at 589, 596–98. In appellant's view, the instruction given here did not "correct the harm because [he] was charged with a crime involving the use of a firearm[,]" so that "[t]he jury "could not simply ignore" having heard from appellant himself "that he had previously been in trouble with another type of gun[.]" Given that the evidence "was purely circumstantial" and "credibility was crucial[,]" appellant argues that "[a]ny perceived taint . . . of [appellant] could only have harmed his case."

The State responds that because "[t]he parties agreed that all the jury heard was that when appellant was 17 years old, he had been playing around with a flare gun[,]" the

51

prejudice was not "the kind of incurable prejudice that would warrant a mistrial." Contrasting "rare" cases where "the evidence the jury is instructed to ignore is so compelling that the court could not rely on the presumption that a juror understands and follows the court's instructions[,]" the State argues that in this instance, the trial court "did not abuse its discretion in denying appellant's motion for a mistrial." *Cf. Arizona v. Fulminante*, 499 U.S. 279, 296, 111 S. Ct. 1246, 1258 (1991) (recognizing that "a full confession in which the defendant discloses the motive for and means of the crime may tempt the jury to rely upon that evidence alone in reaching its decision"); *Coffey v. State*, 100 Md. App. 587, 601–02 (1994) (recognizing that the jury could not be expected to disregard evidence that defendant was convicted for the same crime by another jury).

Generally, inadvertent presentation of inadmissible information may be "cured by withdrawal of it and an instruction to the jury to disregard it[.]" *Cooley v. State*, 385 Md. 165, 174 (2005). We agree that this was not the type of evidence that the jury was presumptively unable to disregard at the court's instruction. Here, the jury was not informed that appellant was charged with another gun crime or involved in another shooting. Nor did jurors hear that he was "in trouble with another type of gun[,]" as appellant contends. Instead, the court determined, after reviewing what the jury heard, that appellant merely said that he "made a mistake when [he] was 17 years old, . . . playing around with a flare gun." Given that this was a single unsolicited and inadvertent reference to an unrelated, remote, and equivocal prior "mistake" (not conviction) that involved "playing" (not shooting) a flare gun (not a rifle), this was not like the evidence of lie detector results, child sexual assault, prior conviction, or motive for murder that "rang the

52

bell" in a manner juries in other cases were unable to disregard. Accordingly, the trial

court did not abuse its discretion in giving the remedial instruction rather than declaring a

mistrial.

**JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

The correction notice(s) for this opinion(s) can be found here:

https://mdcourts.gov/sites/default/files/import/appellate/correctionnotices/cosa/2205s18cn.pdf